## THE ALASKA.

### VAN PELT and others *v.* THE ALASKA.

*(Circuit Court, S. D. New York. 1887.)*

1. COLLISION—TAKING PILOT ON BOARD—DUTY OF STEAMER.
   When a pilot is to be taken on board a steamer at sea, it is the duty of the steamer, when she gets sufficiently near the pilot-boat, to permit the latter to undertake the immediate maneuvers necessary to approach the steamer, to stop her own headway, and leave the execution of these maneuvers and the subsequent details of transferring the pilot to the judgment of the pilot-boat.

2. SAME—TAKING PILOT ON BOARD—EVIDENCE.
   In a suit to recover damages caused by the sinking of a pilot-boat by a steamer during maneuvers incident to the transfer of the pilot, the evidence of experts is admissible to show the usage of navigation under the circumstances of the occasion.

3. SAME—ACTION FOR—LACHES—DEATH OF WITNESSES.
   Eleven months after the pilot-boat had been sunk by collision with a steamer at sea, a libel was filed to recover damages. In the interval between the collision and the filing of the libel the steamer had passed into the possession of a third party, who had no notice of the collision at the time he acquired title. *Held,* that the libelants were not guilty of laches, as their most important witnesses, the crew of the sunken vessel, had perished with her

4. NEGLIGENCE—ACTION FOR DEATH—ADMIRALTY.
   No suit in admiralty, in the courts of the United States, can be maintained, under the general maritime law, to recover damages for the death of a human being on the high seas through negligence.

In Admiralty. Libel for damages.
*James Parker,* for libelants.
*George B. Adams,* for claimants.

WALLACE, J. This libel was filed to recover damages for the loss of the pilot-boat Columbia, and the personal effects of her crew, in consequence of a collision of the steamer Alaska on the night of December 2, 1883, by which the pilot-boat was sunk, and all the men on board were drowned. A supplemental libel was filed to recover damages for the death of the persons lost, on behalf of their respective widows. The district court condemned the steamer for one-half the damages for the loss of the pilot-boat, her furniture, etc., and the effects of the crew; and dismissed the supplemental libel filed by the widows of the deceased sea-

men. Both parties have appealed to this court. Further proofs have been taken by both parties upon this appeal; but the new testimony is principally that of expert witnesses upon matters of usage and opinion, and does not contribute much new light upon the merits of the controversy.

The following facts are found upon the evidence:

The night was dark, but not thick, good for seeing lights, but not for calculating distances; the wind was blowing a gale from the north-west, and the sea was rough. When about 12 miles south-east from Fire Island Light, the Alaska, then heading about west by north, observed the flash light of the pilot-boat bearing about south-west; at that time there were three officers including the master upon the bridge of the steamer, and two look-outs, the latter being stationed there because of the heavy sea which broke on the starboard bow of the steam-ship; the steamer answered the flash light of the pilot-boat by burning a blue light, and starboarded her helm to approach the pilot-boat, going at a speed of about 14 knots an hour, on a course west by south one-half south for 12 minutes; at 11:52 her engines were slowed, and she proceeded at half speed, at the rate of about 8 knots an hour. The pilot-boat shaped her course to the northward and eastward, gradually hauling to the westward to intercept the steamer. After the steamer starboarded her helm the pilot-boat bore two points off her port bow, and the master ordered the man at the wheel to keep the pilot-boat at that bearing; and, as the pilot-boat bore to the westward, the steamer's course was accordingly gradually changed somewhat to the northward; and at 11:57 her speed was slackened from half speed to slow. The steamer proceeded at slow speed, going at the rate of about four knots an hour for nine minutes, when at 12:06 her engines were stopped, and she was then heading to the west one-half south, and the pilot-boat's light bore about south-west by west one-half west. At this time the master of the steamer supposed the vessels had approached sufficiently near to enable the pilot-boat to run down and maneuver to dispatch her yawl, and in order to hold the steamer against the wind, he kept her somewhat under a port helm. In the mean time the gangway had been manned, and a light hung at that place on the port side of the steamer to indicate where the pilot would be received. When the steamer's engines had been stopped two minutes, the mast head-light of the pilot-boat was observed to close in rapidly on the steamer, as though the pilot-boat had hauled to windward to cross the steamer's bow, and had come up into the wind; those in charge of the steamer deemed a collision imminent, and the steamer's engines were put full speed astern immediately. The vessels came into collision; the pilot-boat drifted along the starboard quarter of the steamer, and went down forward of the bridge; the capsized yawl of the pilot-boat, with two or three men clinging to it, crying for help, passed along the port side of the steamer, and went down. The engines were kept at full speed astern for three minutes, and were then stopped. Every exertion was made by the steamer to rescue the crew of the pilot-boat, but without avail, and all the members perished.

The speed of the pilot-boat while approaching the steamer was seven or eight knots, and she was about four knots from the place of collision at the time the steamer starboarded her helm to approach her. At the time the steamer stopped her engines the pilot-boat and the steamer were less than half a mile apart, and were less than a quarter of a mile distant from the place of collision. It was the purpose of those in charge of the pilot-boat to approach across the bows of the steamer, and when ahead to luff and launch her yawl, in order to let the yawl pass along the port side of the steamer, in the lee, while she herself would pass around to the windward by the steamer's stern, and pick up the yawl after the pilot had been put on board. This maneuver

could have been safely accomplished if she had been able to launch her yawl at a sufficient distance ahead of the steamer; but such an attempt was hazardous, unless the steamer was practically at a dead stop and also unless the pilot-boat had sufficient room ahead of the steamer to luff in the wind to launch the yawl when fully 500 feet away; and if she had any less room under the circumstances of the night in question, or if the steamer was under headway, the attempt involved grave risk, and was unjustifiable. The pilot-boat either mistook the distance away of the steamer, or supposed the steamer's headway to be practically stopped, and, crossing the steamer's bow, luffed when within 500 feet, and, probably, considerably less than that distance of the steamer. There were but four seamen on the pilot-boat and a cook, and usually five men are detailed from the crew of a pilot-boat to assist in launching a yawl, although sometimes three, and even two men, are sufficient. Some misadventure attended the attempt to launch the yawl, and in the consequent confusion and excitement the control of the pilot-boat was lost; and before it could be regained she drifted rapidly before the force of the wind, towards and against the steamer's stem. The vessels came together in about three minutes after the steamer had stopped her engines, that is, about a minute after the order to reverse at full speed had been given, and when the vessels came together the steamer's headway had not been materially lessened below a speed of two knots an hour.

At the time of the collision, Mr. S. B. Guion was the owner of the steamer, and he continued to be such owner until the eleventh day of October, 1884, when he transferred her to the present claimant. The libel was not filed until more than 11 months after the day of the collision, and the steamer in the mean time had made 10 trips between the ports of New York and Liverpool. The present claimant held a mortgage on the steamer for £95,311, which had originally been £108,811. At the time of the transfer from Guion the claimant took the steamer at the price of £120,000, paying to Guion in money the difference between that amount and the amount of the mortgage. He had no notice or information of the collision between the steamer and the pilot-boat, until after he had acquired his title. The report of the commissioner in the district court as to the damages sustained by the libelant, is adopted as a correct statement of the amount.

These conclusions of fact have been reached after an anxious consideration of the testimony. If they are erroneous, they are the result of a painstaking effort to reconcile the testimony of the witnesses to the reasonable probabilities of the case; and as they must be accepted as final for the purposes of an appeal, no useful purpose will be served by an extended review of the evidence, or by giving the process of reasoning which has led to them.

Aside from the testimony to show what measures and maneuvers are customarily adopted, and what is safe and proper navigation on the part of each vessel under circumstances like those preceding the collision, the evidence for the libelants consists of the testimony of two witnesses, passengers on the steamer, who saw the closing scenes of the tragedy, and such corroborative testimony as was elicited from the witnesses for the claimant, upon cross-examination, who were, principally, the officers and seamen of the steamer. These two witnesses knew that a pilot was about to be taken on board, and that the steamer's headway had been slowed down for that purpose; but they had paid no attention to the details of the matter. They were called for the purpose of showing the steamer's apparent rate of speed after the first jar of the collision between the ves-

sels had been noticed by them. They both went immediately to the port side of the steamer, and saw the yawl with the men clinging to it pass along the port side towards the stern, until it disappeared from their vision. Both of them make the steamer's rate of speed, as estimated in part from the apparent rapidity with which the yawl passed astern, about seven knots an hour. They are both intelligent and candid witnesses, and, for landsmen, seem exceptionally qualified to give a reliable estimate. But with the wind and the rough sea, even on the lee side of the steamer, their very short opportunity for observation, the excitement of the moment, the difficulty to the inexperienced of making a correct estimate of a vessel's speed under ordinary circumstances, the liability to error is very great; and an allowance must be made, also, for the tendency of the wind to carry the yawl astern and away. Any such rate of speed would have been utterly inconsistent with the object which those in command of the steamer were anxious to accomplish without a mischance which might entail considerable delay, to say nothing of accomplishing it without endangering life. Such a rate of speed presupposes a much higher rate of speed when the steamer's engines were at half speed, and at slow, than can be accepted as true upon any fair view of the testimony. Mr. Roberts, the third officer, thinks that the steamer while running with her engines stopped was under a headway of two and one-half to three knots an hour. With this exception the testimony of all the officers and men upon the steamer is to the effect that she was under a headway not much, if any, exceeding half a knot. Without adverting to the collateral facts elicited from these witnesses tending to impugn the estimate of half a knot an hour, it is significant that it was necessary to keep the steamer at full speed astern three minutes, in order to overcome her headway, and this circumstance, together with the instant apprehension of collision entertained by her officers when they saw the pilot-boat shape her course across the steamer's bows, are very inconsistent with the probability that the steamer was practically under no headway at the time.

Those in charge of the steamer supposed the pilot-boat would approach on the port side of the steamer, and there launch the yawl, so as to get the benefit of the steamer's lee. It is not strange that they indulged this supposition in view of the character of the night, the rough sea, and the force of the gale. The origin of the collision is, undoubtedly, to be traced to their misapprehension of the contemplated maneuvers of the pilot-boat. They assumed that when the vessels should approach sufficiently close to each other the pilot-boat would maneuver so as to launch her yawl in the lee of the steamer, and did not anticipate, as they should have done, that she might prefer to launch her yawl in front of the steamer; and acting upon this arbitrary assumption, and disregarding the consideration that the pilot-boat had the option to maneuver as those in charge of her might think best, the steamer was permitted to draw too near the pilot-boat before her engines were stopped. Consequently her headway was not sufficiently checked to allow the pilot-boat to make her intended maneuver, except at an unnecessary hazard. Several experts of large experience, masters of ocean steam-

ships, approve the conduct of those in charge of the steamer, and state that Captain Murray's judgment that the pilot-boat would not attempt to launch her yawl in front of the steamer's bows on such a night was a judicious one. Nevertheless it cannot be doubted, upon the expert testimony, that the pilot-boat adopted a customary maneuver, although, under the circumstances, it was one attended by more than ordinary risk. Those in charge of the steamer committed the error of substituting their own judgment of what the pilot-boat would probably do, in place of the duty of so governing the movements of the steamer as to permit the pilot-boat to select and execute her own maneuvers. The error is extenuated by many considerations; but it was nevertheless a fault, as distinguished from a mere mistake in judgment.

After signals have been exchanged between a steamer and a pilot-boat, which signify an invitation to the pilot to come on board the steamer, the obvious duty of the steamer is to assist the pilot-boat in placing the pilot on board. If the steamer is a considerable distance off, it is to be assumed that she will alter her course, bear down towards the pilot-boat, and slow her speed; and when she gets within a reasonable distance to permit the pilot-boat to undertake the immediate maneuvers necessary to approach the steamer, to leave the execution of these measures, and the subsequent details of transferring the pilot, to the judgment of the pilot-boat; and this involves stopping her own headway. It has been held in this circuit that the steam-ship has the right to come close to the pilot-boat, and to believe that the pilot-boat will draw near to her, and to assume that one of that active class of vessels will co-operate with her in the effort to bring the vessels close to each other in safety. *The Wisconsin*, 23 Fed. Rep. 831, affirmed upon appeal, 25 Fed. Rep. 283. Proper co-operation between the vessels necessarily implies a duty on the part of the steamer to make the necessary maneuvers to afford a lee for the yawl, to reach the place where the pilot is to be received, and to stop her headway in due season, and to the extent necessary to permit the pilot-boat to select a suitable place for launching her yawl, and for the yawl to come along-side and transfer the pilot without unnecessary risk. No peremptory or precise rule exists, which defines how the duty of mutual co-operation is to be fulfilled. The conduct of both vessels is to be governed by the exercise of such care and good judgment, with reference to the particular circumstances, as would be exercised by prudent and skillful navigators under like conditions. Whether such care and good judgment have been exercised under the circumstances of a particular case, is a question which may depend upon a usage of navigation, and may be ascertained by the opinion of experts. In *The City of Washington*, 92 U. S. 32, evidence of this character was resorted to, and it was shown by expert testimony what maneuvers were adopted by steamships, and what by pilot-boats, when approaching and transferring a pilot; and this was held to be competent, and the usage proved was adjudged to constitute the rule of navigation in that case. It was said in the opinion of the court that a general usage may be proved in respect to any disputed question of navigation not controlled by the sailing rules prescribed by congress. Such a usage is cogent evidence of what is

expedient and prudent in a given case, and, therefore, is important in ascertaining what should or should not have been done under the circumstances.    Moreover, each vessel has the right to assume that the other will conform to the requirements of an established usage, and must govern her own conduct accordingly.    But the existence of such a usage is a question of fact, and a usage shown by the testimony in one case may be disproved in another; and experience shows that, upon questions of nautical usage, expert testimony can be produced of all shades and contrariety of opinion.

As has been stated, the testimony in the present case shows that the maneuver adopted by the pilot-boat was a customary one, although it was one hardly to be expected under the circumstances of the occasion. The steamer cannot be exonerated.    She neglected to do what her duty required, that is to stop in due season, and permit the pilot-boat to select her own method and course in approaching to launch her yawl and send it to the steamer, after the vessels were sufficiently near to enable the pilot-boat to undertake the active responsibility of the enterprise.

. Having found that the pilot-boat undertook the maneuver which ended so disastrously, without knowing that the headway of the steamer was stopped, and when she did not have sufficient room in front of the steamer to execute it prudently, it follows that she was also guilty of fault. The disaster cannot be attributed solely to the fault of one of the vessels. The case is not one where the negligence of either was remote or immaterial.

The claimants cannot reasonably invoke the doctrine of laches to defeat the suit.    As was held in *The Key City*, 14 Wall. 660, no arbitrary or fixed period of time in delaying the assertion of a maritime lien has been, or will be, established as an inflexible rule, but the delay which will defeat such a suit must in every case depend on the peculiar equitable circumstances of that case.    Admiralty denies the privilege of enforcing the lien which has been suffered to lie dormant, without excuse, until the rights of innocent third persons would be prejudiced if it should be recognized.    Here, the circumstance that those who, it may be assumed, would have been the most important witnesses for the libelants, perished in the collision, is a sufficient excuse for the delay of 11 months, which intervened between the time of the collision and the filing of the libel.    Indeed, when the suit was brought, and until the time of the trial in the district court, the cause of the libelants seemed almost hopeless.    The testimony of the two passengers was the fragile prop of their case.    Ordinary prudence justified their hesitation during the period which elapsed, before incurring the expense and burden of asserting a claim so precariously fortified.

Since the decision in *The Harrisburg*, 119 U. S. 199, 7 Sup. Ct. Rep. 140, it must be accepted as settled that a suit in admiralty cannot be maintained in the courts of the United States, to recover damages for the death of a human being on high seas by negligence, under the general maritime law.    The supplemental libel was therefore properly dismissed by the district court.

. There will be accordingly a decree for the libelants, dividing the loss and the costs of the district court and this court.