## THE AGNELLA.

(District Court, S. D. Alabama. July 15, 1912.)

No. 1,306.

1. COLLISION (§ 3*)—EVIDENCE (§ 516*)—FAULT—GENERAL USAGE.

General usages having the effect of obligatory regulations to prevent collisions may be referred to by the courts as furnishing the rule of decision to determine whether any fault of navigation was committed in a particular case, and the testimony of experts as to such general usage is admissible.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 3; Dec. Dig. § 3;* Evidence, Cent. Dig. § 2325; Dec. Dig. § 516.*]

2. COLLISION (§ 87*)—STEAMER AND PILOT BOAT—RULES GOVERNING MOVEMENTS.

There being no rules specifically governing the navigation of steam vessels and pilot boats during the maneuvers incident to the transfer of a pilot, their movements should be governed by the exercise of care and good judgment and established usage, and it is the duty of each vessel in such case to watch the movements of the other, and of the steamer to stop or come to a very slow speed at a safe distance from the pilot boat.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 178; Dec. Dig. § 87.*]

3. COLLISION (§ 11*)—FAULT—RULES OF NAVIGATION.

A vessel has the right to assume that another will conform to the law and established usage and should govern her own conduct accordingly.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 10; Dec. Dig. § 11.*]

4. COLLISION (§ 87*)—STEAMER AND PILOT BOAT—NEGLIGENT NAVIGATION OF STEAMER.

A collision in Mobile Bay between an incoming steamer and a pilot schooner, which was taking a pilot to the steamer, held due solely to the fault of the steamer, which had the pilot boat on her starboard side on a crossing course; it being shown that the pilot boat followed the established custom of the port, which was to stop ahead of the steamer and launch a small boat with the pilot and then proceed across the steamer's course, but that the steamer, instead of keeping her course at slow speed to pick up the pilot, turned to port and attempted to pass across the bows of the pilot boat.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 178; Dec. Dig. § 87.*]

In Admiralty. Suit by Thomas A. Johnson and others, owners of the pilot boat Jordan, against the steamship Agnella, for collision. Decree for libelants.

Stevens & Lyons, of Mobile, Ala., for libelants.
Pillans, Hanaw & Pillans, of Mobile, Ala., for claimant.

TOULMIN, District Judge. The schooner Jordan was a pilot boat operating in the harbor and bay of Mobile, and approaches thereto. On the 29th of April, 1911, while in the process of transferring a pilot from the said schooner to the steamer Agnella, outside of and in her approach to the entrance of the channel in the bay, said steamer collided with said schooner and seriously damaged her.

The libel is to recover the damages resulting from the collision. It alleges, in substance, that the collision occurred solely through the faults of said steamer, in that she changed her course and negligently undertook to cross the bow of the schooner. And the libel charges that said steamer was guilty of negligence in said conduct and maneuvers. It is denied by the respondent that the steamer is guilty as charged, and it is insisted that the schooner was at fault: (1) In attempting to cross the bow of the steamer; and (2) that those in charge of the navigation of the schooner were guilty of negligence in signaling the steamer to go to her rear.

[1] General usages having the effect of obligatory regulations to prevent collisions between vessels engaged in navigation are constantly referred to by the courts as furnishing the rule of decision to determine whether any fault of navigation was committed in the particular case; and, if so, which of the parties, if either, was responsible for the consequences. Evidence of experts as to such general usage regulating the matter is admissible. The City of Washington, 92 U. S. 31, 23 L. Ed. 600; The Alaska (C. C.) 33 Fed. 107. It was the duty of each vessel to watch the movements of the other. The Monterey, 161 Fed. 97.

[2] In the present case the steamer had observed the pilot boat and the launching of the yawl with the pilot for her in it one-half to three-quarters of a mile away. She should have observed their movements thereafter and to have come to a stop, or to a very slow speed at a safe distance from the pilot boat. We will consider later whether or not she did so.

The Monterey Case (D. C.) 153 Fed. 935, was an action for collision between the schooner pilot boat Hermit and the steamship Monterey. The court in its opinion said:

"The evidence is singularly barren of estimates of distance, and such as are given do not seem valuable, for the night was very dark, though clear, so that lights could readily be seen; but the ships themselves were concealed from each other until collision was inevitable."

And further said:

"It is obvious from the record, and is indeed admitted by both counsel, that the collision could not have happened without either (1) such inat-

tention on the part of the Hermit as laid her course directly across that of the Monterey, or (2) from an unlawful change of course and maintenance of high speed on the part of the Monterey."

The court held that the collision was due solely to the fault of the pilot boat in so changing her course as to cross the steamer's bow, and said:

"Whether the Monterey's speed was low or high, she was entitled to assume that the Hermit would not cross her bow." The Monterey (D. C.) 153 Fed. 935.

The case was appealed, and the Court of Appeals in its opinion said:

"If the steamer had observed the pilot boat, she would have come (as it was her duty to do so) to a stop or to a very slow speed at a safe distance from her."

Adding that:

"The conclusion is irresistible that those on board the steamer who ought to have been diligently observing the pilot boat were not doing so." The Monterey, 161 Fed. 97, 98, 88 C. C. A. 261, 262.

The decree of the court below was reversed, and both vessels were held at fault.

There was no statute defining the course of navigation to be followed by either vessel, and no custom or usage was shown or claimed defining such course. Moreover, the pilot boat in that case changed her course, leaving the wheel lashed while the pilot went below, and leaving no lookout.

The substance and effect of the decision of the Court of Appeals in the case is that the pilot boat was at fault in changing her course so as to cross the steamer's bow, in the absence of a statute or rule of navigation defining or authorizing such course to be followed, and in failing to diligently observe the movements of the steamer; and that the steamer was at fault in not diligently observing the pilot boat, or, if she did observe her, in not coming to a stop or to very slow speed at a safe distance from her.

"It is the duty of a steamship when about to take on a pilot at sea to come to a substantial stop, i. e., to reduce her headway to a minimum speed required to keep her in position. She should not adopt a veering course, calculated to thwart the maneuvers of the pilot boat as the latter approaches, but to come as near to a stop as possible, and leave the rest to the pilot boat." The Alaska (C. C.) 33 Fed. 107.

"In a suit to recover damages caused by the sinking of a pilot boat by a steamer during maneuvers incident to the transfer of the pilot, the evidence of experts is admissible to show the usage of navigation under the circumstances of the occasion." The Alaska (C. C.) 33 Fed. 107.

The court in this case said that:

"The conduct of both vessels is to be governed by the exercise of such care and good judgment, with reference to the particular circumstances, as would be exercised by prudent and skillful navigators under like conditions. Whether such care and good judgment have been exercised under the circumstances of a particular case is a question which may depend upon a usage of navigation, and may be ascertained by the opinion of experts."

Expert testimony is held to be competent, and the usage proved adjudged to constitute the rule of navigation. The Alaska, supra; The City of Washington, supra.

[3] Each vessel has the right to assume that the other will conform to the requirements of an established usage, and must govern her own conduct accordingly. The Alaska, supra; The Monterey, 153 Fed. 935, supra.

"The rule that vessels may each assume that the other will obey the law, or an established usage, is one of the most important in the law of collision." Authorities supra.

Local rules or customs are binding, and are enforced by the courts. Hughes on Adm. pp. 215, 232; The Victory, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519.

"Under them, if followed, collisions need never occur unless by some negligence or inattention which no rules can prevent." Hughes on Adm. p. 215.

[4] The existence of a custom in this port on the part of pilot boats, when preparing to give a pilot to a steamer, to stop and launch a yawl ahead of the steamer and in her path, and to sail on ahead and across the course and bow of the steamer, is clearly proven. It was shown to be the custom for the yawl, with the pilot, to be left astern of the pilot boat, and for the steamer to come along and pick up the pilot. That this method of transferring a pilot from the pilot boat to a steamer was customary and proper is fully established by the testimony of pilots who had had practice and experience in the business, three of whom were with the pilot boat on the occasion of the collision. Indeed, the testimony of the master of the Agnella is substantially the same as that of libelants' witnesses as to the usage and practice shown by them.

The steamer was heading west. The pilot boat was sailing about south southeast. The vessels were approaching each other on intersecting lines. When a half or three-quarters of a mile away, the master of the steamer says he saw the pilot get into the skiff and two other persons in it with him plainly, a mile or three-quarters of a mile. He also says that, when he first sighted the pilot boat, he gave the man at the wheel orders to keep his course, to steer west; that he gave him no further orders until he was three ship's lengths from the pilot boat, and then gave him orders to steer southwest, and "kept giving him signals to steer south"; and that he changed his course four points to the south. The steamer's length is 212 feet. The wind was light and there was no sea. The collision occurred early in the forenoon. Said master says he at no time "saw so much open water between the skiff and pilot boat that he could run between them"; that he "only saw the skiff when she was towing astern." He says, however:

"I think the skiff was in tow of the pilot boat a short time before the collision. I did not see or notice it at the time of the collision. The last time I noticed the skiff she was only a few fathoms from the pilot boat. I noticed when the pilot first got into the skiff, a half or three-quarters of a mile away."

He testifies that when the pilot boat was about a couple of his ship's lengths from the ship, which was running at slow speed, about 3½ miles, he began starboarding his helm and changed his course to southwest until he got a signal from the pilot boat to go astern of her; then he went full speed astern and changed his wheel hard to port; that he had so much headway that the ship would turn faster if he changed her helm to amidship, and he did so. He says he did not know whether the ship had lost her headway through the water when the schooner and ship came together. But he says if there had been no signal given by the schooner to go astern, and if he had not undertaken to obey the signal, he would have missed the schooner altogether; that he would have gone ahead of her. He adds:

"I think it (the collision) was due to the pilot signaling me to go astern instead of keeping on my course."

Regarding the launching of the yawl, and her position at the time of the collision, the testimony of the three pilots concerned and participating in the maneuver is, in substance, that when the pilot boat was from a quarter to half a mile ahead of the steamer, and some 250 yards north of the point at which the collision occurred, the yawl was launched, and Pilot Smith and two other men boarded her. She was towed for a short distance—some five minutes or so—by stern line from the schooner as she proceeded on her forward course across that of the approaching steamer, when the schooner let her go to await, near the path and on the starboard side of the steamer, her coming to take on the pilot; that at the time of the collision the yawl was north of and 200 to 250 yards astern of the schooner. It will be observed that the evidence of the master of the steamer on this point is not in conflict with that of the libelants' witnesses, except impliedly as to the position of the yawl. He says he noticed the yawl when the pilot first got into it; that, the last time he noticed it, it was only a few fathoms from the pilot boat, but he did not see or notice it at the time of collision.

The claimant's witness Aspaas, the helmsman on the steamer, testified that the pilot boat let go the yawl a very short time before the collision, and that there was never much space between the yawl and the pilot boat; but his evidence is so indefinite as to distance between them, and as to their relative positions, besides being contradictory in other respects to the evidence of the master, and in conflict with that of the pilots, it is entitled to little or no weight. And the testimony of claimant's witness Christiansen is so absolutely in conflict with the evidence of the other witnesses, and with the physical facts shown by the undisputed evidence in the case, as to render it unworthy of any consideration.

As to the claim of the master of the steamer that, had there been no signal from the pilot boat, and had he not undertaken to obey the signal to go astern, he would have missed the schooner, and there would have been no collision, the evidence of the pilots on the schooner is that the signal given and the pointing to the yawl with the pilot in it, well north of and astern of the pilot boat, was

given to apprise the steamer of the location of the yawl, and was given when the steamer was far enough away to enable her to easily go astern of the pilot boat and pick up the pilot. If such was the situation, as contended by the libelants, then manifestly there was no fault and nothing improper in the giving of the signal by the pilot boat. But if the fact was that the signal was given when the steamer was so close upon the pilot boat that, by the exercise of every means in her power she was unable to stop her headway, or to so change her course as to pass astern of the pilot boat, then, as stated by the master of the steamer, she could have passed safely across the bow of the pilot boat.

There was no obligation on the master and navigator of the steamer to have obeyed or have regarded the signal. It was optional with him to attempt to comply with it. If he deemed it unsafe or running a risk of collision with the pilot boat to have undertaken the maneuver adopted, he should not have attempted it, and that whether he understood the meaning of the signal or not. If the situation in which the steamer found herself was brought about through her fault or by her unskillful or improper maneuvers, she cannot visit the consequences on the pilot boat.

The master is presumed to have known better than any one else what his ship might and should do to avoid a collision under the circumstances, and under which he had no right to be controlled by those on board the pilot boat.

The testimony shows that the course and maneuver of the pilot boat was the customary one, and that adopted by the steamer was not. The latter's unnecessary deviation from her course west to that south or southwest in her attempt to cross the bow of the pilot boat was violative of the well-known usage and practice in such cases.

The steamer was neglectful of her duty required by the custom and the law in not proceeding on her course without deviation, and at slow speed, to enable the pilot boat to launch the yawl, with the pilot, on the course of the steamer for her to take on the pilot; or to stop in due season to enable the pilot boat to perform the duty devolving upon her, and then proceed on her course across the bow of the steamer and out of her way.

When the steamer changed her course, and, in her attempt to cross the bow of the pilot boat, came so near to her as to risk collision with her, she failed to exercise the precautions required by law to be taken when there is risk of collision. Such precautions must be taken in time to be effective against such risk, or they will constitute no defense to liability if collision occurs. The Westhall (D. C.) 153 Fed. 1010.

The steamer should have come to a stop or to a very slow speed at a safe distance from the pilot boat. The Columbia (D. C.) 27 Fed. 704; The Alaska (C. C.) 33 Fed. 111; The Monterey, 161 Fed. 97, 88 C. C. A. 259.

The master of the steamer must have failed to observe the movements of the pilot boat and of the yawl. He testifies he did not

notice those of the yawl after he observed it launched and the men in it. It was his duty to diligently observe these movements.

The evidence shows there was nothing effective that the pilot boat could do, in the extremity created by the steamer's manifest fault, to prevent the collision. The Bulgaria (D. C.) 168 Fed. 459.

Let a decree be entered for libelants, with reference to Richard Jones, clerk, as commissioner, to ascertain and report the damages to be awarded.