## THE PHILADELPHIA.

(District Court, E. D. Pennsylvania. January 9, 1917.)

No. 23.

1. COLLISION ⊜87—STEAMER AND PILOT BOAT—PRACTICE IN DISCHARGING PILOT.

It is proper and usual to discharge a pilot from the lee side of the vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 178; Dec. Dig. ⊜87.]

2. COLLISION ⊜87—STEAMER AND PILOT BOAT—PRACTICE IN DISCHARGING PILOT.

It is proper and frequent practice for the pilot to decide from which side he will leave the ship, and to make his arrangements accordingly.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 178; Dec. Dig. ⊜87.]

3. COLLISION ⊜87—STEAMER AND PILOT BOAT—PRACTICE IN DISCHARGING PILOT.

It is proper and the usual practice, in discharging pilots, for the vessel having the pilot aboard to lay to and stay stopped, making in so doing the side from which the pilot has arranged to leave the lee side.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 178; Dec. Dig. ⊜87.]

4. COLLISION ⊜87—STEAMER AND PILOT BOAT—PRACTICE IN DISCHARGING PILOT.

It is proper and customary for the pilot boat to do whatever maneuvering is necessary to take off the pilot, and for the other vessel to stay stopped and do nothing.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 178; Dec. Dig. ⊜87.]

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Collision ⬲87—Steamer and Pilot Boat—Practice in Discharging Pilot.**

It is a proper and frequent course for the pilot boat, if under steam when she approaches another vessel to take off her pilot on the weather side, to go astern and round up on the lee side; but there is nothing improper in her coming to on either side, the choice being a matter of convenience only.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 178; Dec. Dig. ⬲87.]

**6. Collision ⬲102—Steamer and Pilot Boat—Mutual Faults.**

A steamship and a pilot boat approaching to take off the steamer's pilot both *held* in fault for a collision between them; the pilot boat being in fault for miscalculating the conditions under which she attempted to make a turn, so as to come around on the starboard side of the steamer, and the steamer in permitting her bow to swing to starboard as the pilot boat was making the turn.

[Ed. Note.—For other cases, see Collision, Dec. Dig. ⬲102.]

In Admiralty. Suit for collision by Gustav Claude, master and part owner of the steamship La Flandre, and as bailee of her cargo, against the steam pilot boat Philadelphia. Decree for libelant for half damages.

Howard M. Long, of Philadelphia, Pa., for libelant.
Lewis, Adler & Laws, of Philadelphia, Pa., for respondent.

DICKINSON, District Judge. This controversy grows out of a collision. The place was just outside of the Overfalls Lightship at the entrance to Delaware Bay. The time was about 2:30 o'clock p. m. on May 9, 1915. The weather was clear, the sea smooth, with no wind to hamper the proper handling of either vessel, plenty of sea room in which to maneuver, and no vessels or other obstructions to interfere. From such a very general outline statement the fact of collision would suggest some unexpected and unforeseen happening or fault in the handling of one or both vessels. If to this outline is added the further fact that one of the vessels was a steamship about to discharge her pilot, and the other was a pilot boat ready to take the pilot off, and there was nothing to account for the collision, other than the handling of the vessels, an anticipated finding of culpability somewhere would be compelled. If the further fact developed that the steamship had been brought to a stop, and nothing remained to be done, except for the pilot boat to round up near the steamship, so that the pilot could be taken off in a yawl, and that in rounding up the pilot boat ran into the steamship, an explanation of the mishap, if not due to the fault of the pilot boat, would be demanded.

There is just this prima facie case made out against the respondent. It is evident that the explanation must be looked for in the particular detail facts, and not in the broad ones. It is not difficult to visualize the movements of each vessel down to almost the immediate moment of the collision. Each was looking for and expecting the other. What was to be done was known to each. What was done on board each vessel is not in dispute. The testimony of the witnesses respecting

what took place is in accord, except as to the movement of the steamship in fact, and what movement would have resulted from the way in which she was handled. The difficulty which confronts the, libelant is to reconcile the particular (and in this sense the minor) things which, according to the weight of the evidence, did happen with the main facts for which the libelant contends. The difficulty which confronts the respondent is to find any exculpating features in the particular facts which will overcome the condemnation involved in the main facts.

The following statement, although perhaps not entirely accurate, is one over which there is no substantial dispute: The pilot boat was made out by the steamer when the vessels were from four to six miles apart. When first sighted, the pilot boat bore off the steamer's port bow, but her position was practically dead ahead. The order to stand by was given, and the course of the steamer was changed so as to make the pilot boat bear off the steamer's starboard bow. A course of S. S. E. kept her so.

There are obvious advantages in the pilot leaving the ship from the lee side, and this is usual. The wind was about N. N. W., and as this was nearly a following wind, either side might have been made the lee side. Whatever difference there was favored making the port side the lee side. The pilot so decided, and the ladder was there slung. The order to stand by was followed at 2:10 with an order to slow down, and this at 2:18 with an order to stop, and this at 2:22 with full speed astern, and this almost at once (entered as of 2:23) with stop. The expectation on the part of every one aboard the steamer was that the pilot boat would pass on the starboard hand, come around under the steamer's stern, and range alongside the steamer on her port side. This expectation was a very natural one on their part, and this course would have been an entirely proper one for the pilot boat to have taken. From the viewpoint of the steamer, the orders given resulted in her speed being reduced from 8 or 8½ knots to 6, and from that to a half knot, or at most a knot (when her engines were reversed), and then to a dead stop. Her heading during this time had not changed from S. S. E. From the further viewpoint of the steamer, the pilot boat came up on the starboard hand, ported her helm, and instead of coming around the steamer's stern, and ranging alongside on the port side (as those aboard the steamer expected her to do), she put her helm hard aport and attempted to make the turn short of the steamer, so as to round up on the starboard side. Coming at the speed at which the pilot boat was moving, there was not room for this maneuver, and the collision was brought about.

The libelant, on this version of the facts, presents this plain case—the steamer brought to a stop with the port side made the lee side, and preparations made to discharge the pilot from that side, and the pilot boat colliding with her in the attempt to round up alongside. The case as thus made out would be free from all difficulties in affixing the blame, except for the circumstance that it is impossible to understand how the collision could have been brought about in this way, consistently with certain other features which the weight of the evidence shows to have been present. Whatever the real facts are, the weight of the

evidence establishes that the pilot boat approached on a course parallel (in reverse) to that of the steamer; that she did not port her helm until she was abeam of the steamer (somewhere between just forward of amidship of the steamer and off the steamer's quarter); that the pilot boat was moving at the rate of 7 knots; that she struck the steamer head-on a right-angle or nearly right-angle blow at a point about 50 feet aft of the steamer's stem. Add the facts that the steamer was about 280 feet and the pilot boat about 148 feet long, and it becomes impossible to account for what happened, if the steamer did not go astern or swing her bow to starboard.

The place of contact seems to be established beyond question. The clear weight of the evidence is toward the finding of the blow being a right-angle blow. It follows that one of four things must be: The pilot boat must have made her turn as she was approaching the steamer; the steamer must have had sternway on; the bow of the steamer must have swung to starboard, thus putting her athwart the course of the pilot boat as the latter came around; or some new element accounting for what happened must be brought in. Wherever the truth may be found, the case as presented entitles the respondent to a finding that the pilot boat did not change her course until she came abeam or abaft the beam of the steamer. The libel itself avers this, and all the testimony bears it out. There is nothing in the evidence or in the circumstances to justify a finding that the steamer was going astern. The only circumstance, other than those stated, is that the man at the wheel of the pilot boat realized the imminence of the collision just before it occurred, and that he dropped the wheel and reversed his engines to full speed astern, so far checking his headway that the pilot boat was almost stopped, and immediately backed away from the steamer.

These latter facts were not introduced for the purpose, nor is there any suggestion, in the evidence or in the argument, that they account for the collision consistently with the steamer not having changed her course. The respondent asks for a finding that she did change her course, not only because no other explanation will explain the collision, but also because of the evidence introduced that the effect of reversing the engines of the steamer would be at once to throw her head to starboard.

The theory of the defense, based upon such finding, is that it was the duty of the steamer to come to a stop; that it was the duty and right of the pilot boat to do all the maneuvering, including the side of the steamer from which the pilot was to be discharged; that the pilot boat was properly handled with this end in view; that she allowed herself ample room in which to make the turn; and that it would have been made with success, except for the unwarranted and unexpected act of the steamer in reversing her engines, by which her head was swung to starboard across and directly in front of the pilot boat as she came around.

The exculpating feature of this defense is involved in the prophecy that the pilot boat would have come around clear of the steamer, and

the consequent averment of due care in attempting to bring her around within the space allowed. This is based upon the evidence that the courses of the two vessels were an eighth of a mile apart, and that the pilot boat, running under one bell, was making seven knots, and could be safely turned within that distance. This finding we are unable to make. There was nothing in what was required to be done to justify the pilot boat in not giving herself ample room. Proper space is inconsistent with the fact of the collision, even after making the most liberal allowance for the extent to which the space was narrowed by the swing of the steamer. There is no such certainty as to what space there was as to justify much reliance upon opinion testimony. Distances on water are proverbially hard to estimate with anything like accuracy. The evidence itself is not convincing. It merely goes to the extent that the pilot boat could be turned in a space of 760, or even 600, feet or less. This is, of course, qualified by the statement that to turn her in a limited space her engines must be properly handled. The testimony of several of the witnesses contains the significant qualification that the boat could be brought around within the given space, not that she did come around under the given conditions.

The conclusions reached, with such discussion as they call for, are stated in numbered paragraphs:

[1] 1. It is proper and usual to discharge the pilot from the lee side.

[2] 2. It is a proper and frequent practice for the pilot to decide from which side he will leave the ship, and to make his arrangements accordingly.

[3] 3. It is proper and the usual practice, in discharging pilots, for the vessel having the pilot aboard to lay to and stay stopped, making in so doing the side from which the pilot has arranged to leave the lee side.

[4] 4. It is proper and customary for the pilot boat to do whatever maneuvering is necessary to take off the pilot, and for the other vessel to stay stopped and do nothing.

[5] 5. It is a proper and frequent course for the pilot boat, if under steam when she approaches the other vessel on the weather side, to go astern and round up on the lee side. There is nothing, however, improper in the pilot boat coming to on either side of the other vessel. Whether she comes to on one side or the other is wholly a matter of convenience, and to facilitate reaching the side of the other vessel in a skiff or yawl to take off the pilot. In the present case, which side of the steamer was made the lee side is of no importance, and has no significance, other than its bearing upon the movements of the vessels. Either side might have been made the lee side. The pilot on the steamer was justified in arranging to leave from the port side, and in making that the lee side, and in expecting the pilot boat to round up under the steamer's stern. The pilot boat, however, was equally justified in deciding to come to on the starboard side of the steamer. The only effect in itself of the pilot boat coming to on the one side or the other would have been the taking of the yawl boat around the steamer, or shifting the steamer's ladder from one side to the other. The only

significance this feature has is the extent, if any, to which it bears upon whether the steamer held her position or swung her head to starboard.

[6] 6. The pilot boat is found in fault in miscalculating the conditions under which she attempted to make the turn, so as to come around on the starboard side of the steamer, and the collision and consequent damages were primarily due to this.

7. The weight of the evidence, as shown in the proofs, favors a finding (and it is accordingly so found) that the bow of the steamer swung to starboard just before the collision, thereby contributing to the extent of the damages. This is based upon the finding before made that under the pleadings and the proofs the pilot boat did not begin her swing to starboard until the vessels were about abeam, and that the vessels at the moment of collision were about in a right-angle position, and that the steamer was struck about 50 feet from her stem. The only theory which would justify a finding that the steamer had not changed her heading is that the pilot boat ported her helm before she reached a point abreast of the steamer, and this fact we are not at liberty to find under the averments of the libel and the testimony of the witnesses. The degree to which this fault of the steamer contributed to the collision or the consequent damages cannot be determined otherwise than by an equal apportionment.

8. An interlocutory decree, in accordance with these findings, that the libelant recover one-half its damages, with full costs, may be entered.

The libelant has offered no explanation of how the pilot boat, not starting to round up until she was abeam of the steamer, could have struck the steamship far forward, and a head-on right-angle blow, if the steamer was stopped and her head had not swung toward the course of the pilot boat.

The only answer to respondent's theory of the collision is to challenge the fact of a head-on or right-angle blow, and to assert a glancing or side swiping blow. A more plausible explanation of what happened would be supported by an averment that the pilot boat made her turn as she was coming up abreast of the steamship and before she was abeam. As before observed, however, whatever the facts may be, the respondent cannot be denied its right to the findings made under the pleadings and the evidence. The libel avers that the pilot boat was abeam before she made the turn, and that the collision was a head-on right-angle one. All the testimony asserts the first fact, which is the really controlling one, and several witnesses testify to the second, and this second fact is convincingly attested by the effect of the collision upon each vessel, and particularly upon the pilot boat, which had no marks upon her (although freshly painted), except upon the extreme edge of her stem. A further theory might be evolved that the steamer had properly swung her head to starboard for the purpose of making her port side the lee side. To support any theory which is consistent with the two facts which are too well established to be doubted, viz. that the pilot boat struck the steamship a right-angle blow and struck her near the bow of the steamer, the libel and the evidence would both have to be recast, or to be ignored. This the trial court cannot do.

239 F.—26

The conclusions reached are in accord with the doctrine stated in Spencer on Collisions and the rulings in The Washington, 92 U. S. 31, 23 L. Ed. 600, The Alaska (C. C.) 33 Fed. 107, and The Anegar, 123 Fed. 473, 59 C. C. A. 277, to which we have been referred.