### THE BLACK GULL. *

PETERSON et al. v. UNITED NEW YORK SANDY HOOK PILOTS ASS'N et al.

No. 250.

Circuit Court of Appeals, Second Circuit.
March 9, 1936.

*Writ of certiorari denied 56 S. Ct. 954, 80 L. Ed. ——.

J. Harvey Turnure, of New York City, for certain appellants.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel; Frank J. Zito, of New York City, on the brief), for other appellants.

Stefferson & Bourke, of New York City (Raymond E. Stefferson, of New York City, of counsel; Edwin M. Bourke, of New York City, on the brief), for appellees.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

On the early morning of January 26, 1933, the steamship Black Gull, bound for Antwerp and other European ports, proceeded down New York Harbor in charge of Hugh McIntyre, a Sandy Hook pilot. Shortly before 5 a. m. the pilot boat Sandy Hook was sighted at the outer pilot station near Ambrose Channel Light and was signaled by the steamer at McIntyre's request to take him off. There was a 45-mile gale from the northeast, and waves were running as high as 10 feet from crest to trough. Rain was falling intermittently; the visibility of objects on the sea was very poor. The steamer came to a stop with the wind and sea on her port beam, and the pilot boat rounded her stern and took a position in her lee about 170 feet to starboard. A 17-foot yawl was then launched from the pilot boat, manned by Peterson and Strandberg, who rowed toward the Black Gull. Protected by the lee of the steamer they brought the yawl alongside a rope ladder which had been dropped over the starboard side just forward of the bridge. McIntyre got in and the yawl was pulled away from the steamer. In the meantime the pilot boat had started up at full speed and hard over helm to circle to the right. The purpose of this maneuver was to come around behind the steamer so that, when the yawl had pulled away, the pilot boat would be in position to take over the lee provided by the steamer, which could then move on. Thus the pilot boat could pick up its yawl without its being exposed to the unchecked fury of wind and sea. The diameter of the Sandy Hook's circle took it more than a thousand feet away from its original position, and, when it had turned sufficiently to head toward the Black Gull, nothing was seen of the yawl. As it continued on, shouts were heard from the weather side, and one of the men on the pilot boat caught a momentary glimpse of the yawl about 200 feet abaft the port beam. Again the Sandy Hook made a circle to the right for the purpose of coming around to windward of the yawl, but it was never again sighted, although the search was continued for several hours both by the Sandy Hook and by another pilot boat. The Black Gull had proceeded to sea when her master thought the Sandy Hook was near enough to be able to take over the steamer's lee. About 10 a. m. a witness on shore saw the yawl with three men in it founder in the breakers off Monmouth Beach, N. J. This was $12\frac{1}{2}$ miles from where the Sandy Hook had lost her. The yawl came ashore, but the pilot and the two seamen were never found. It is conceded that they were drowned.

The District Court held the Black Gull at fault because it moved on too soon and before there was reasonable ground to believe that the Sandy Hook was near enough to make a lee for the yawl. It held the pilot boat at fault mainly for failure to keep an adequate lookout for the yawl. The appeal attacks these findings of fact and raises also several questions of law.

The libel in rem was brought only under the Act of March 30, 1920, relating to the maintenance of actions for death on the high seas. 46 U.S.C.A. § 761. No suit in rem will lie under the Jones Act (46 U.S.C.A. § 688). See Plamals v. Pinar Del Rio, 277 U.S. 151, 48 S.Ct. 457, 72 L.Ed. 827. The libel in personam,

760

however, relies on both. It alleges two causes of action in respect to each decedent. The first cause of action claims damages for loss of support and is based on both acts; the second cause of action is based solely on the Jones Act, and claims damages for pain and suffering of the decedent prior to his death. Exceptions filed by American Diamond Lines, Inc., and Black Diamond Steamship Corporation, the owner and operator, respectively, of the Black Gull, were sustained as to the causes of action based solely on the Jones Act by the representatives of Peterson and Strandberg, since they were not employed by these respondents. Peterson v. United New York Sandy Hook Pilots' Ass'n (D.C.) 6 F.Supp. 649.

The exceptions were not sustained as to the similar cause of action on behalf of McIntyre, and it is now urged that he also should have been held not to be in the employ of the steamship companies because they were compelled by statute to accept his services. Compare Homer Ramsdell Co. v. La Compagnie Generale Transatlantique, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155. But we think it unnecessary to decide this question. The Jones Act extends to seamen who shall suffer personal injury in the course of their employment the remedies accorded by federal statutes to railway employees. Under the original Employers' Liability Act (35 Stat. 65 [45 U.S.C.A. § 51 et seq.]), the cause of action of the injured employee abated on his death. Michigan Cent. R. Co. v. Vreeland, 227 U.S. 59, 67, 33 S.Ct. 192, 57 L.Ed. 417, Ann.Cas.1914C, 176. By the amendment of 1910, 36 Stat. 291 (45 U.S.C.A. § 59), his right of action for personal loss and suffering, where his injuries were not immediately fatal, was caused to survive to his personal representative for the benefit of his dependents. Hence the personal representative may now recover on behalf of the designated beneficiaries not only such damages as will compensate them for their own pecuniary loss, but also such damages as will be compensatory for the conscious pain and suffering of the injured employee while he lived. St. Louis & I. M. R. Co. v. Craft, 237 U.S. 648, 658, 35 S.Ct. 704, 59 L.Ed. 1160; Chicago, B. & Q. R. Co. v. Wells-Dickey Trust Co., 275 U.S. 161, 162, 48 S.Ct. 73, 72 L.Ed. 216, 59 A.L.R. 758. Granting that any cause of action which

pilot McIntyre could have maintained had he lived, survived to his administrator, it remains to consider whether he had such a cause of action. The libel alleges that the yawl was abandoned and lost through the culpable negligence of the respondents, and that thereby McIntyre "suffered personal injury, physical and mental; excruciating pain, agony and nervous shock," and was "rendered sick, sore and lame from the time of the beginning of said abandonment and exposure until the time of his death." But the record is barren of any evidence to support these allegations. At the moment before the yawl up-ended and threw its occupants into the sea, two men were seen to be rowing and one was apparently steering with an oar in the stern. There is nothing to indicate that McIntyre had suffered any physical injury prior to his death. Knowledge of the danger which he faced while battling the storm in the small yawl may well have caused mental anguish even to so hardy and experienced a mariner as McIntyre, but the negligent causing of emotional distress which does not result in bodily harm is not recognized by the law as an actionable wrong. American Law Institute Restatement, Torts, § 313. Hence no recovery could be had under the second cause of action alleged on behalf of McIntyre and based solely on the Jones Act.

Nor is it necessary to decide whether liability under the first cause of action, which claims damages occasioned by his death in depriving his widow and infant daughter of support and maintenance, can be rested on the Jones Act, since the Wrongful Death Act imposes the same liability and is not limited to employes of the vessel or person causing the death. Thus it is apparent that the Jones Act may be dropped out of the case, and we are not called upon to decide whether a compulsory pilot may be deemed an employee of the vessel he pilots, if the Black Gull and the steamship companies owning and operating her are liable for the pilot's death under the Wrongful Death Act.

This act creates a liability in favor of the representative of the decedent "whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas." 46 U.S.C.A. § 761. The right of action is for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative, and is against the vessel,

person, or corporation which would have been liable if death had not ensued (46 U.S.C.A. § 761). Recovery is limited to just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought (46 U.S.C.A. § 762).

 To render a vessel, person, or corporation liable under this statute, the death must be caused by a wrongful act; that is, there must be a violation of some legal duty owed to the decedent. We have assumed that a compulsory pilot is not an employee of the vessel in the sense that a member of her crew is such. Therefore any duty of protection owed to him, as well as any such duty owed to the oarsmen of the yawl, must rest on some other basis than employment. Such a basis can be found, for in taking on or discharging a pilot in rough weather the steamer and the pilot boat together undertake an enterprise which puts the occupants of the yawl in a position where their risk of harm may be greatly increased by the conduct of the other vessels. By undertaking the enterprise both the steamer and the pilot boat should be held to assume duties toward the men in the yawl to use reasonable care to carry the enterprise through without increasing their danger. Illustrations of this principle may be found in the law of torts. American Law Institute Restatement, Torts, § 302. Slater v. Illinois Central R. Co., 209 F. 480 (C.C.Tenn.); Perkins v. Galloway, 194 Ala. 265, 69 So. 875, L.R.A.1916E, 1190; Gill v. Middleton, 105 Mass. 477, 7 Am.Rep. 548; Glanzer v. Shepard, 233 N.Y. 236, 239, 135 N.E. 275, 23 A.L.R. 1425; Faulkes v. Met. Dist. R. Co., 5 C.P.Div. 157; Bohlen, Landlord and Tenant, 35 Harv.L.Rev. 633, 665. The principle is well phrased in the statement that "the hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all." Mock Co. v. Rensselaer Water Co., 247 N.Y. 160, 167, 159 N.E. 896, 898, 62 A.L.R. 1199. See, also, Cortes v. Baltimore Insular Line, 287 U.S. 367, 374, 53 S.Ct. 173, 77 L.Ed. 368. The precise point under discussion seems to have been little, if at all, discussed in maritime cases. In The Alaska, 33 F. 107 (C.C.S.D.N.Y.), a collision occurred between the steamer and a pilot boat which resulted in the loss of all the pilot boat's crew, including several men in her yawl. Judge Wallace remarked (33 F. 107, at page 111): "After signals have been exchanged between a steamer and a pilot-boat, which signify an invitation to the pilot to come on board the steamer, the obvious duty of the steamer is to assist the pilot-boat in placing the pilot on board."

It is equally obvious that a similar duty existed with respect to the yawl and its occupants, though the question was not decided, as there was then no statute authorizing recovery in a suit in admiralty for death by negligence on the high seas. The Harrisburg, 119 U.S. 199, 7 S.Ct 140, 30 L.Ed. 358. Beyond doubt the Black Gull owed McIntyre and the oarsmen of the yawl a duty to co-operate in their safe transit from the steamer's side to the pilot boat.

 This duty required the steamer to stay where she was until the pilot boat had sufficiently completed her turn to be in position to come up and provide a protecting lee for the yawl when the steamer moved on. The Black Gull was well advised of the proposed maneuver of the Sandy Hook, and knew what part she herself had to play to co-operate in it. The District Court held that she negligently got under way too soon and before she had reasonable grounds for believing that the pilot boat could take over her lee. We are asked to reverse this finding of fact based upon conflicting testimony. To do so we should have to be firmly convinced that it was wrong. On the contrary, we think it clearly right. Not only is there testimony to support it, but the probabilities favor it. The proof of this is that the pilot boat passed the yawl on her port beam and before she had reached the steamer. It seems incredible that this could have happened had the steamer not moved on, for the pilot boat was aiming to come up astern of her to take over her lee. The yawl could not have drifted astern of the steamer in that wind and sea, and it is unthinkable that the oarsmen should voluntarily have rowed beyond her stern instead of remaining in her lee. The only rational explanation is that the steamer moved ahead too soon. The bell book entries tend to substantiate this. The steamer's engines were stopped for two minutes, from 4:58 to 5 a. m. They were then put slow ahead, and half ahead at 5:01. There is a notation that

the pilot left the steamer at 4:58. If the yawl was rowing away abeam of the steamer for two minutes, it could not have gotten far away, because the steamer was making substantial leeway, while the yawl in her lee would make much less. Capt. Frisco testified in his deposition that the yawl was in his lee and only 150 to 200 feet away when the steamer got into motion. He seeks to excuse this early start by saying that the Sandy Hook was only about a ship's length (400 feet) away, but his testimony contains many admissions that she was at a much greater distance. It is plain that she was. Only if the pilot boat's circle was flattened to make for the stern of the steamer as she moved ahead is there a reasonable explanation of the pilot boat's getting to leeward of the yawl before reaching the steamer. That the Black Gull was at fault in the respect found by the District Court is amply established.

It is next urged that McIntyre assumed the risk of leaving the steamer because he declined the captain's invitation to go on to Europe and because he told Capt. Frisco to go ahead as soon as the yawl pulled away. The first ground is wholly unsubstantial; he did not assume the risk of the steamer's subsequent negligence by deciding to leave her. The second ground is destroyed by Capt. Frisco's testimony that he did not act on McIntyre's word to go ahead, but used his own judgment and waited until the pilot boat was near enough to take over the lee. Hence McIntyre's direction was not a cause of the steamer's premature departure and cannot be deemed an assumption of the risk of the captain's negligent mistake in judgment.

There is a further contention that, even if the Black Gull was at fault in starting ahead too soon, this was not the proximate cause of the deaths of the three men in the yawl. The argument is that withdrawal of the steamer's protecting lee might naturally result in the yawl's being immediately swamped but, as this did not happen, the final tragedy can be ascribed only to faults of the pilot boat in losing the yawl and to contributory faults of the decedents themselves. As to the latter it is said that the yawl was equipped with coston lights and a water light for use in just such an emergency, and, had they been used, the yawl would have been immediately discovered and

picked up. Just why no lights were displayed by the yawl is a mystery which can never be solved. Whether their use was overlooked or whether they were tried and found defective or for some other reason could not be lighted is pure speculation. Contributory negligence of the decedents cannot be proved by a complete absence of evidence. Nor can they be charged with fault in trying to land through the breakers at Monmouth Beach instead of keeping on to a point off the not distant Coast Guard station in the hope of getting aid. It was a decision made in extremis, and we can know nothing of the considerations which prompted it. To the contention that the Black Gull did not contribute to the loss of the yawl, it is answer enough to point out that the steamer was the bearing for which the pilot boat was making and by which she judged the location of the yawl. The natural and probable consequence of the premature moving of that bearing was the loss of the yawl. As to the liability of the Black Gull and the respondent steamship companies we entertain no doubt.

We turn now to questions concerning the liability of the owners of the Sandy Hook. She cannot be charged with fault for making her first round turn instead of lying in the steamer's lee until the yawl should return. Possibly she could have done the latter, but the maneuver she chose was a permissible alternative and there was no reason to suppose it would not succeed with the co-operation to be expected from the steamer. Nor do we think liability can be predicated on her decision to circle to the right instead of the left when the yawl was discovered to be to the windward. It is in dispute which maneuver was the better seamanship under all the circumstances and the alternative chosen does not indicate so serious an error of judgment as to justify the imposition of liability on this score. The question of liability comes down to the matter of lookout, the ground upon which these respondents were held by the District Court.

The opinion below states that "No one from the time the Sandy Hook started on its first right turn was charged with the duty to look out for the yawl." It is true that no one was posted to, and no one did, look back for the yawl when the pilot boat turned away from the Black

Gull on its first circle. But an attempt to do so could have availed nothing until the turn was nearly completed, for the Sandy Hook's searchlight could not be directed backwards because of the interference of the smoke stack, nor could its rays be effective to disclose the yawl beyond an estimated distance of 400 feet. When the Sandy Hook had completed its turn sufficiently to direct its course toward the steamer, the searchlight was used, and two men were on lookout in addition to Gjoerloff, the officer on watch, whose duties at the wheel would preclude him from being considered an adequate lookout. These men were Miller, in the pilot house, and Mueller, on the starboard deck. Miller was a pilot who was carried to be available to put aboard incoming steamers, but it was testified that it was customary for such pilots to stand a regular watch. Miller said that he was on watch in the pilot house from 4 to 6 that morning, and that, when the pilot boat had come about and its searchlight was shot along the leeward side of the Black Gull, he was looking for the yawl. Seaman Mueller, who had helped launch the yawl, testified that he was supposed to be watching out for the yawl and did so. He was not on the forecastle-head because it was impossible for a man to stand there in that sea. He stationed himself by the pilot house on the starboard deck, which was the side on which the yawl was expected to be seen when the pilot boat came around to pick it up. It was he who heard the shouts, ran aft to a position amidships, sighted the yawl abaft the port beam, and reported it to Gjoerloff, when the Sandy Hook was passing it. Obviously he was attentive to his duty as lookout at that time. The most that could be charged against the pilot boat is that there should have been a man in the pilot house in addition to Miller and that the searchlight should have been kept sweeping ahead on both sides instead of directed only toward the lee of the steamer. But the thought that the yawl might be to port of the pilot boat would never occur to any one so long as the steamer was supposed to have held her position, as she should. All attention and precaution would naturally be directed toward the side where the yawl would surely be if the steamer performed her duty of co-operating in the maneuver. Hence we cannot say it was a fault not to sweep the searchlight to port, nor that the failure to have stationed as lookout in the pilot house a regular member of the crew, if it was a fault, contributed to the loss of the yawl, since his attention would certainly have been focused, as was Miller's and Mueller's, toward the right side only. The District Court made no finding of fact which controverts any of the above-mentioned testimony or inferences therefrom. Consequently, to our minds, the adequacy of the lookout kept by the Sandy Hook is established. But, if there were doubt, the fault of the steamer in moving on too soon is so obvious and inexcusable and of itself so sufficient to account for the loss of the yawl that any doubt as to the pilot boat's conduct should be resolved in its favor. The Victory & The Plymothian, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519.

Accordingly, the decree is modified in accordance with the foregoing opinion. Appellate costs are awarded to the pilot associations against the steamship corporations.