Brown, District Judge.
Between 3:30 and 4 p. m. of October 27, 1891, as the schooner “Rose Culkin” bound down the bay from the Erie Railroad dock at Jersey City, was approaching Ellis island, she came in collision with the steam tug Nickerson, striking with her stem the port side of the tug at an angle of from five to eight points. Both received damages, for which the above libel and cross libel were filed. The wind was blowing such a gale from the northwest, or west northwest, that a lighter came down to the westward of the schooner sailing under bare poles. The schooner was light, about 74 feet long, and sailing under a jib, foresail and two reefed mainsail, and she was going through the water at the rate of about 10 knots, or against the flood tide about 8 *329 knots by land. The tug had taken the barge Kodiak in tow on a hawser of 18 fathoms from the anchorage ground south of Ellis island, and was heading about east for the Battery nearty across the tide, and going at the rate of about 2 knots through the water. The place of collision was near the edge of the anchorage ground a little to the northward and eastward of Ellis island, probably about 200 yards below the permanently anchored barge above Ellis island, and less than 100 yards to the eastward of that barge. The witnesses' for the schooner contend that the collision was brought about by a sudden turn of the tug to starboard across the bows of the schooner, when the latter was 100 feet distant. The tug’s witnesses deny this, and contend that the collision happened because the schooner, after heading so as to pass to the westward of the tug and tow, paid off to the eastward in the attempt to cross the bow of the tug when very near.
1. The schooner had come down about one-third the distance across from the Jersey shore, and, as her witnesses say, was heading towards Owl’s Head. But in her three different pleadings it is stated that her course was southwest, which is three points more to the westward than the course for Owl’s Head. If instead of being upon a southwesterly course, she was making for Owl’s Head, without any change of course, as her witnesses contend, she must have gone at least 300 yards to the eastward of the place of the collision.
The ordinary course down the bay is south by west one-half west; and that course also would have carried the schooner considerably to the eastward of the place of collision. To account for the collision at all, therefore, I must find that she was not heading as her witnesses say she was, but more nearly towards the southwest as her pleadings allege, and as the tug’s witnesses also state; and such a general course would have carried her to the westward of the tug and tow as the latter’s witnesses allege. The tug’s course was necessarily about due east, interrupted but a short time by a little starboarding in accordance with a signal of two whistles given a few minutes before this collision to a large steamer which came down the bay and passed to the eastward. As the tug was bound for the East river and previously heading about due east, there is small probability that she at any time, with no apparent motive or necessity, turned from four to five points to the northward, so as to head to the westward of the schooner’s southwesterly course. It is difficult to make out what Capt. Woglan means to testify to. He first saw her about 900 feet off, he first says; afterwards he says about four lengths off, or less than 300 feet. The tug, he says, was then heading for the Battery, and if she had kept her course she would have passed under his stern. Yet that course was nearly due east, and no further swing to the eastward is claimed in the schooner’s pleadings. The claim that the collision was caused by the sudden porting of the tug when only 100 feet away, whereby she threw herself across the schooner’s bow, is absurd. Going only about one fifth as fast as the schooner, the tug could not in any such space have materially changed her position. The apparent change of the tug was caused, I have no doubt, by the real change of the schooner’s heading, as the other witnesses state. The whole case on the part of the *330 schooner presents such contradictions and inconsistencies as to make it impossible to place much reliance on their testimony concerning her navigation.
The persons in the best position to judge of the course of the schooner, were the captain of the Kodiak, who was behind the tug, and the persons on the Raymond alongside the barge. They all testify that the schooner at some little distance away was heading towards or to the westward of the tug and tow; that she luffed up somewhat in passing the anchored barge so as to go very near to it, and that had she continued that luff, she would have passed the tug and tow without difficulty to the westward; but that instead of doing this, she paid off again when near the barge apparently attempting to cross the bow of the tug,’ and thus brought about the collision. The account given by the schooner is so inexplicable and unreliable, that I am compelled to adopt the above as substantially correct; so that it becomes unimportant to determine what previous yawing, or what-' changes of heading before that had been made by the schooner, or whether her course when from one fourth to one half mile distant was such as to go to the eastward or to the westward’ of the tug and tow, about which the witnesses differ. The fact that she got so near to Ellis island from a position one third across the North river, proves that she was all the time working to windward of the usual course down the bay. She was probably unsteady; and the fact that the schooner’s master, lookout, and crew saw no steamer go down just before them, and only saw the tug when she was near and roused their attention by her whistles, proves great negligence and inattention in their navigation at such high speed, and in part explains the confusion and contradiction in their testimony. But the tug’s narrative and the testimony of disinterested witnesses leave no doubt that after having approached near the tug and upon a course to the westward of the tug, the schooner brought on collision by a sudden change of her course and an attempt to cross the tug’s bow. This was at her own risk and fixes the blame on her, because there was undoubted room to continue on her previous course to the westward of the tug and tow.
2. I do not think, under the circumstances, any fault can be ascribed to the tug. Though bound, under rule 20, to do all she could to keep out of the way of the schooner, she was not bound to do more than was possible. But what is possible to a tug and tow going at the rate of two knots through the water, as respects a schooner coming down near the line of her course at the rate of ten knots ? The ordinary rule presupposes an ability to keep away, and a relative freedom of motion in the steamer as respects the sailing vessel. When those conditions are mainly reversed, the exceptional case arises that is provided for by rule 24. The A. P. Cranmer, 1 Fed. Rep. 255; The C. F. Ackerman, 9 Ben. 179. Under such circumstances, when the tug has comparatively small power to make any change in her position, in respect to a sailing vessel at high speed, it is the duty of the sailing vessel seasonably to shape her course with reference to the situation of the tug and tow, and not to rush blindly into danger, or into such close quarters that it is practically im *331 possible for the tug to avoid accident. The general testimony on the part of the schooner indicates that her master, from the time he saw the tug, intended to act on this principle; but that from miscalculation through not observing the tug and tow seasonably, or by undertaking to run too close, or at the last by some vacillation or change of purpose, he brought about the collision by attempting to cross the tug’s bow. Both the master and the lookout of the schooner ascribe the collision to the change made by the tug when not over a hundred feet off. This apparent change as I have already said, was the schooner’s change; not the tug’s. Nothing the tug could possibly have done within any such small distance could have contributed anything material either to bring on, or to avoid, the collision. And before the schooner’s change, so certain is it that she was working up close to windward towards the southwest, that I am satisfied the best the tug could do to keep out of her way was to pull off to the eastward, as she did, as fast as she could. The course when heading for the Battery was about east by north, instead of northeast by east as stated by the captain. But this error is immaterial. I must, therefore, hold the collision to have occurred by the fault of the schooner. •
3. The amount of damages sustained by the Nickerson being in excess of the amount in the registry realized from the sale of the Culkin, viz., $888.05, it has been objected both in the answer to the petition and on the argument, that the petitioner cannot limit her liability to that sum, through a surrender and sale of the vessel, because immediately after the filing of the Nickerson’s libel, the petitioner, as owner of the Culkin, gave a stipulation in that cause for $3,500, as the agreed yalue of the vessel; and having afterwards repaired her, thereafter employed her in making a number of voyages between New York and Rockaway during about seven weeks prior to the filing of the petition to limit liability, with the offer to surrender the vessel; this being nearly four months after the libel was filed.
The stipulation for value in the sum of $3,500, seems on the evidence to have been given unadvisedly, and in ignorance of the right to limit liability under the statute. The petition was not filed until after a substitution of proctors. But aside from this circumstance, the stipulation in all such cases is only to abide by and pay the. decree of the court. The proceeding to limit liability under the statute, however, if lawfully taken, stays further proceedings in pending suits. This would prevent any enforcement of a prior stipulation, even though a decree were obtained before the petition was filed. Such was the express adjudication in The City of Norwich, 118 U. S. 468, 489, 6 Sup. Ct. Rep. 1150. In the present case the proceedings to limit liability were taken before decree or trial. If rightly taken, the}’’, therefore, supersede the prior stipulation, because the court cannot make any order for its enforcement. Providence, etc., Co. v. Hill, etc., Co., 109 U. S. 578, 3 Sup. Ct. Rep. 379, 617.
The only question, therefore, is whether the circumstances above stated are sufficient to debar the petitioner from proceeding to limit her *332 liability by a surrender of the vessel, instead of giving security for the value of the vessel and freight at the close of the former voyage. For the latter method of procedure would have been sustained by the express adjudication of the supreme court in The City of Norwich, which is a much stronger case in its circumstances, both as regards the difference between the amount, of the original stipulation, and the fund distributable, and as to the time during which the vessel was run upon subsequent voyages before the proceeding to limit liability was commenced.
I have not found any reported case precisely like this, in which after the release of the vessel on a stipulation for value and the prosecution of subsequent voyages, she has been offered for surrender in a subsequent proceeding to limit the original liability. The proceedings have been usually taken by giving security, with reappraisements if necessary, as in the cases of The City of Norwich, supra, and The Doris Eclchoff, 30 Fed. Rep. 140. Such cases have been frequent. The only case found having any analogy to the present is that of The Alpena, 8 Fed. Rep. 280, where the petitioner sought to group together, under one surrender, the claims of several creditors arising out of different voyages, viz., that of one creditor for collision damage, who had sued 'the owner in personam, and the claims of various other damage claimants arising out of the stranding of the vessel on a voyage five weeks after the voyage on which the collision occurred; and the petitioner surrendered the wreck, strip-pings and freight upon the last voyage, claiming a discharge from both sets of creditors. Judge Blodgett held that this could not be done; and that the former collision claimant was not bound by the proceeding.
There can be no doubt, I think, of the correctness of that decision, for the conclusive reason that the owner had there disabled himself by his subsequent employment of the vessel and by her stranding, from effectively “transferring his interest in the vessel” as it existed at the close of the former voyage. The statute (section 4283) limits the shipowner’s liability to “the value of his interest in the vessel and pending freight;” and this means as they exist at the close of the voyage. City of Norwich, 118 U. S. 468, 491-493, 6 Sup. Ct. Rep. 1150. And see Gokey v. Fort, 44 Fed. Rep. 364; The Abbie C. Stubbs, 28 Fed. Rep. 720; The Anna, 45 Fed. Rep. 900. To tender afterwards something of materially less value, is not a compliance with the statute. The “transfer” required by section 4285 is a transfer of the same valuable “interest” which section 4283 prescribes as the limit of liability. If by the owner’s acts or laches the “value of his interest in the vessel” is substantially diminished, he is no longer able by a surrender of the vessel to “transfer” the interest or value which the statute contemplates; the creditor in that mode of proceeding would not get “the value of the owner’s interest” (section 4283) at the close of the voyage. The shipowner’s right to proceed by surrender must, under such circumstances, therefore, be held lost, though the right to proceed by either of the other three methods pointed out by the supreme court, including that by giving security for value at the close of the former voyage, might remain. The Scotland, 105 U. S. 24, 34, 35.
Upon those grounds, therefore, although the mere subsequent naviga *333 tion of the vessel cannot be treated as a personal assumption of the debt such as to exclude all right to limit liability afterwards, or “perhaps so long as and damage or loss remains unpaid,” (per Bradley, J., in The Benefactor, 103 U. S. 245; The City of Norwich, 118 U. S. 489, 6 Sup. Ct. Rep. 1150; Gokey v. Fort, 44 Fed. Rep. 364,) yet if the Rose Culkin had been stranded, or otherwise so damaged, or so depreciated in her subsequent voyages, as to be of substantially less market value than immediately after this collision, I should have held that the right to proceed by surrender was gone, and that the owner must resort to some one of the other modes of proceeding to obtain the benefit of the act. But the schooner in this case was herself damaged by the collision; she was then repaired and improved,, her navigation afterwards was for seven weeks only; no accident is shown to have happened to her; and the petition avers that when tendered she was in as good a condition as at the close of the prior voyage. Meantime her liability was not certain, but strenuously cop tested; the owner was but imperfectly at least informed of her rights; and when the surrender was offered, her responsibility was still unadjudicated, and her liability denied. If the value of the vessel was unimpaired, and the creditor in no way prejudiced by the use meantime, I cannot perceive any sound reason why, under circumstances like these, the right of surrender, which the statute expressly gives, should be refused.
In the absence of any time limit, the only limitations upon the statutory right of surrender, are such as are to be deduced from the general principles of law, or from the manifest purpose of the act. Every privilege, no doubt, may be waived, or lost by laches, or forfeited by the voluntary act of the party incompatible with its exercise. Mr. Justice Bradley, in The Benefactor, 103 U. S. 239, 246, intimates that the proceedings to surrender must be taken “within a reasonable time;” and Mr. Justice Blatchford says the transfer is to be made before “anything has intervened amounting to a waiver or forfeiture of the right to make a transfer.” Thommasen v. Whitwill, (Great Western,) 12 Fed. Rep. 891, 902. But the time is not unreasonable if even the liability is in doubt, and not yet adjudged (The Benefactor, supra, 244) and if the delay and use of the vessel before the surrender have been short, and not such' as to diminish her market value. Under such circumstances as exist in this case there is manifestly no intentional waiver; nor should any forfeiture of the owner’s right, under such circumstances, be adjudged, if the creditor’s rights and interests remain substantially unimpaired, and the owner’s dealing with the vessel has not been designedly such as to prejudice or embarrass the creditor.
These views are in accord with the construction given abroad to similar provisions in the ordinance of 1681, and in article 216 of the French Code of Commerce, which embody the long prevailing law of the maritime countries of Europe, and from which the surrender provision of the act of 1851 was drawn. The ordinance of 1681 (liv. 2, tit. 8, article 2) provided that the owners might be discharged from responsibility for the acts of the master, “by abandonment of the ship and freight,” (en aban *334 donantleurbastinetet lefret.) The Code of Commerce provides (article 216) that as respects obligations for the acts and contracts of the master relating to the ship and voyage, “the owners may in all cases discharge themselves by surrender of the ship and freight,” (par Vabandon du navire et du fret.) As the law prescribes neither time nor condition, Emerigon says the surrender “may be made in any manner whatsoever * * * and in any and every case,” (du quelque maniere que ce soit * * * en tout etat de cause. Traite de Contrat de la Grosse, c. 4, § 11, sub. 6.) Bedarride says, (1 Comm du Com. Mar. § 288) “As a general rule the abandonment may be made at any time (en tout etat de cause) so long as the owner has not expressly renounced it. This determination may be inferred from acts incompatible with the exercise of the right.” Goirand (Code of Commerce, § 216) says, “the owner may abandon * * * so long as by his conduct he has not shown that he intended to make himself responsible for the liabilities of the captain.” In this general proposition all seem to concur. As regards a renunciation or wiver of the right, Desjardins says: “It suffices, but it is necessary, that it result from acts implying on the owner’s part the intent to pay the debt personally,” which the judge of the facts is “to determine upon the circumstances.” (2 Droit Com. Mar. § 295.) Valroger (1 Droit Mar. § 274) says: “Abandonment can be made in all cases, provided it has not been clearly renounced, and there has been no judgment personally condemning the owner.” As respects subsequent voyages, he says “the owner will not be presumed to have waived the right to abandon so long as no formal claim has been made upon him.” And in this all text writers and decisions seem also to agree. If new voyages are undertaken after suit, continues Valroger, (§ 274,) the owner “ought in general to be presumed to have waived his right as respects that creditor, whose rights upon the ship he should not be allowed to compromise; but the voyage must be one that implies the intent to waive the right of surrender.” In the resumé of this subject given in the recent supplement (1890) to Jurisprudence Generale, by Dalloz, it is said: “The right to surrender the ship can no longer be exercised when the owner has done acts implying that he has renounced the use of his right. Such is the case where after suit the owner has employed the vessel on new voyages, in consequence of which she has been damaged; [citing the case of The Rochelais, infra] but not where judicial notice of the claim was not delivered to him until after signature of the charter party, from which it was sought to infer an implied renunciation of his right; nor if, after departure upon a new voyage, the owner, makes declaration of abandonment, when sued by the creditor; and the abandonment may be first made on appeal.” Sup. 6 Droit Mar. p. 93, §§ 328, 329. In the case of Le Rochelais, the court of appeals of Poitiers, 3d July, 1876, affirmed the judgment of the court below, denying the owner of that vessel the right of abandonment where the owner had employed the vessel in various voyages in the fishing business, for more than six months after suit, until she was wrecked by stranding, and then offered to surrender her in that condition. The surrender was refused on the ground that the wreck “no longer represented *335 the vessel as of the time when the owner’s liability was fixed, (ne representent plus le navire des 10 et 11 Fevr. 1875,) being “no longer in condition, or entire, but damaged anew by the owner’s own act, and the nature of her condition changed,” (dínatwré.) Dalloz, 1877, part 2, p. 70.
In the later case of The Alfred, in the court of appeals of Caen, (Feb. 15, 1888,) it is said “The right of abandonment continues until the proprietor has renounced it; and renunciation, if not express, can result only from acts or facts implying on his part a fixed determination (volenti arretí) with knowledge of the facts (en connaissance de cause) to renounce his right; and that the right was not lost by new voyages in execution of a charter made before suit, and when in executing them the owners had not intended to accept indirectly the consequences of a responsibility, the whole extent of which they had not up to that time understood.” 5 Revue Int. Droit Mar. 189; 4 Revue Int. Droit Mar. 398. In a note to that case the editor of the Revue observes that “the continued navigation of the ship before suit constitutes no obstacle to the right of abandonment; but if continued after suit, it is, according to Desjardins, a question of fact and intention; and is still permissible, according to De Courcy et Lyon-Caen et Renault, Questions, etc., 2d Serie, p. 175.”
The tribunal of Amsterdam, 10th January, 1873, under a similar provision of the Netherlands Code, (section 321) held that “the right of abandonment is not lost, in principle, though the ship, equipped, undertakes a new voyage; but if the new voyage is commenced after suit, the rights and duties of the owner are modified; ’’.and in that action the right was disallowed. Jour. Droit Inter, privé, 1875, p. 146. In the brief notice of the case last cited, the circumstances are not stated, as respects the duration of the navigation, or whether the vessel sustained any injury, or depreciation, thereby.
In the projected revision of the French Code in 1867, additional sections were proposed giving the right of abandonment “ at any time before suit in the tribunal of commerce;” and requiring that “after such suit the owner desiring to abandon must give notice thereof through the marshal within eight days at the latest after suit brought against him.” The projected revision of 1867 was not, however, adopted. But provisions to the same effect were inserted in section 492 of the ■Code of Italy, adopted in 1882. The Code of Chili allows abandonment of the ship “ even after her departure, under whatever condition she may be, provided the owner has not formally renounced that right, and the abandonment is made before judicial sale.” 2 Desjardins, Droit Mar. § 296.
These citations show that in the foreign practice under a surrender provision like our own, a surrender of the vessel is not barred by her subsequent navigation even after suit, unless the vessel is damaged, or an intent is found to waive the right of surrender.
After suit, the situation of foreign creditors under the foreign practice is somewhat different from that of creditors under our own practice. The former have no suit in rem, and do not in the first instance ob *336 tain security for their claims, as is common with us. Consequently, the navigation of the vessel after suit there, is more at the risk of the creditor than it' is here; because if the vessel is lost, and the owner is not otherwise responsible, there the claim will be lost, though no attempt to surrender be made; while here the security usually obtained by the creditor will remain.
In holding the surrender to have been lawfully made in this case, the delay having been without prejudice to the creditor, I do not intend to sanction any long-continued navigation of the vessel after suit in ordinary cases. On the contrary, that, in most cases, must result injuriously to the creditor, not only through the loss of the interest on the fund, which a timely surrender and sale would produce, but through the natural depreciation in the vessel itself. If the owner sought to make good this depreciation by subsequent repairs, then the sufficiency of the restoration would be liable to become an additional subject of litigation; and it would be unjust and impolitic that any such additional burden of litigation should be imposed upon the creditor. Various circumstances may affect an owner’s right to surrender. If the vessel, for instance, had been kept purposely out of the jurisdiction, so that the creditor could only sue in personam, and the vessel was meanwhile deliberately used for the owner’s profit, so that if she were lost the creditor must rely on the doubtful personal responsibility of the owner alone, such acts of deliberation and of speculation on the chances of-navigation, to the creditor’s prejudice, and at his risk, might well be held to be a forfeiture of the,, owner’s right of surrender. The owner in short ought to be held to the exercise of good faith and fair dealing with the creditor. All subsequent navigation of the vessel must in any event be wholly at the owner’s risk; because if the vessel is not of equal value to the creditor when tendered, the right to surrender should be held lost. On the other hand, the owner’s obligations and necessities may be such as to make an immediate surrender specially injurious to him; and where the liability itself is doubtful and not yet adjudged, it would be unreasonable to subject the owner to such loss by requiring an immediate surrender before his liability was determined. Every case must be determined upon its circumstances. “Each,” says Mr. Justice Bradley, “will suggest the proper course to be pursued therein.” The Benefactor, 103 U. S. 245. No objection having been made at the time of the surrender of the vessel, or on the motion for her sale, that she was not of as much value to the creditor when surrendered as she was after the collision, and no such averment being found in the answer, I excluded at the hearing some evidence offered for the petitioner that she was of equal value, supposing that question not to be in issue; but under one of the general denials of the answer, I think the evidence should have been received. Either party may, therefore, within 10 days take evidence .by deposition on that point, and be further heard thereon, unless the averment in the petition in that regard be admitted by stipulation; in the latter case, decrees may be entered in accordance herewith.