THE MONTEREY.

(Circuit Court of Appeals, Second Circuit. April 14, 1908.)

No. 194.

1. COLLISION—STEAMER AND PILOT BOAT—RULES GOVERNING NAVIGATION.
   A steamer and a pilot boat which have agreed to come to a standstill, so that the pilot boat's yawl may bring a pilot to the steamer, are not navigating on independent courses, and the statute creates no presumption that one is the privileged and one is the burdened vessel, and defines no course of navigation to be followed by either. It is a case of special circumstances in which the vessels are co-operating in an agreed maneuver, and each is bound to act prudently toward the agreed end.

2. SAME—NEGLIGENT NAVIGATION—MUTUAL FAULT.
   The sinking of a schooner pilot boat at sea in the night by being run down by a steamer on board which she had agreed by signal to put a

pilot *held* due to the fault of both vessels, neither of which was properly attentive to the movements of the other.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 52.]

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below, see 153 Fed. 935.

Carter, Ledyard & Milburn, Edmund L. Baylies, and W. J. Taylor, for appellant.

Wing, Putnam & Burlingham and Harrington Putnam, for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. A collision occurred about 4 a. m. December 15, 1906, between the schooner-rigged pilot boat Hermit and the steamer Monterey, after an agreement had been reached between the vessels that a pilot should be received on the steamer's port side. The steamer struck the starboard side of the pilot boat about amidships nearly head-on, causing her to sink in about five minutes, all on board being saved by the yawl.

The Hermit while cruising on her station, with a fresh breeze from the southeast, was hove to on her starboard tack heading E. by S., with her masthead light showing all around the horizon and her side lights burning, but screened. About 3:30 a. m. she discovered the masthead light of a steamer to the southward and eastward, and immediately began to show her torch. The steamer answered with a blue light, and the Hermit wore around to the northward until she got on a course S. by W. ½ W., when she uncovered and showed red light to the steamer. In the meantime the steamer's red light and a ladder light on her port side had become visible. After holding this course for about seven minutes, the Hermit again wore around to the northward on a hard aport wheel, which shut out her red light from the steamer, and, as the booms jibed over, she uncovered her green light, and maintained a course approaching the course of the steamer for four or five minutes, showing her masthead and green lights, during which time almost all her crew were engaged in launching the yawl on her port side with her sails between them and the steamer. The Monterey, coming up the coast on a N. by E. course, saw the pilot boat's torch about 3:30 a. m., answered with a blue light, and gradually hauled in to a N. NW. course, which she held steadily for about 10 minutes before the collision. She saw the red light of the pilot boat and no other light until suddenly her green light appeared close aboard on the port bow. Seven minutes before the collision she was proceeding at full speed of 10 knots and at 4:05 on seeing the green light slowed, and at 4:06 went full speed astern, and put her helm hard aport, the collision occurring between that time and 4:08, when her engines were stopped. The pilot boat attributes the collision to a rapid change of course by the steamer under a starboard helm, while the steamer attributes the collision to the attempt of the pilot boat to cross her bows, and to her failure to show proper lights. No signals of alarm were given by either vessel to the other, and it is evident that neither discovered the prox-

inity of the other until the collision was inevitable. The district judge found the pilot boat solely at fault, and dismissed her libel.

It is difficult to imagine how such a collision could have occurred without the fault of both vessels; for vessels sailing on courses the steering and sailing rules seek to prevent collisions by defining one as the privileged vessel and requiring her to keep her course and speed and one as the burdened vessel and requiring her to keep out of the way. In a collision between such vessels, the burdened vessel must be held at fault, unless the privileged vessel has violated her statutory duty. But a steamer and a pilot boat which have agreed to come to a standstill so that the pilot boat's yawl, may bring a pilot to the steamer are not navigating on independent courses at all. The statute creates no presumption that one is the privileged and one is the burdened vessel, and defines no course of navigation to be followed by either. It is a case of special circumstances. The vessels are co-operating in an agreed maneuver, and each is bound to act prudently toward the agreed end. In this case, as the pilot boat intended to come to a stop about a mile ahead and on the port bow of the steamer, it is evident she could not have been watching the steamer's movements. On the other hand, if the steamer had observed the pilot boat, she would have come (as it was her duty to do) to a stop or to a very slow speed at a safe distance from her.

The pilots testify that their masthead light was burning, and continued to burn until it was submerged. As they are compelled by law to carry this light, and it is their distinctive sign, on the display of which their living depends, and as it shows all around the horizon and can be seen from any part of the deck, we find that it was set and burning. There is no dispute that the green light was burning, and the pilots testify that it was uncovered as soon as in wearing around the booms jibed over so that it would be visible to the steamer. This was a natural thing to do, and we find it was done. The diagram submitted by the claimant of the movements of each vessel for seven minutes before the collision shows that the green light would have been visible to the steamer for more than three minutes before the collision. Both these lights should have been seen by those on the steamer, and would, if seen, have advised them of what the pilot boat was doing. We are confirmed in this conclusion about the pilot boat's lights by the very unsatisfactory testimony on the subject from the steamer. In the first place, no one of the witnesses examined from the steamer saw the pilot boat's masthead light at all, nor the green light until the collision was inevitable. Nor did anyone see her torch light, except the second officer, who says he saw it twice, and the master, who saw it half a dozen times. Giacche, the lookout on duty from midnight to 4 a. m., saw the red light 10 to 15 minutes before he left the watch on the port side, and no other light at all. Ranier, who relieved him at 4 a. m., saw the red light and no other light. Stuart, the quartermaster on duty at the wheel, says the pilot boat was reported at a quarter of 4, and the only light he saw was the green light a little on the port bow, not over a ship's length away. Van Sicklen, who relieved him at 4 a. m., says he saw the red light on the port side about two minutes to 4, and then the green light. Korn, third officer, on watch on the bridge

from midnight to 4 a. m., saw the pilot boat's torchlight about 3:35, afterwards saw the red light, and at eight bells lost the red light. Banvard, second officer, who relieved him at 4, saw the green light, and no other. Smith, the master, who had been on duty for nine hours, saw the torchlight about 3:30, and half a dozen torches in all; saw the red light and then lost it; next saw the green light about the same bearing as the red light, on the port bow, just before collision. Mackie, second assistant engineer, in charge until 4 a. m., got a full speed bell 3:52, slow 4:05, when he went up on the main deck, and saw the green light about a ship's length away on the port bow. Mehlman, first assistant engineer, relieved Mackie at 4:05, got full speed astern 4:06 and stop 4:08. The entries in the ship's logs give confirmation of the negligence of those on the steamer.

The scrap log states:

"3:50. Full ahead; pilot boat on port bow showing red light.
"4:00. Slow.
"4:05. Pilot boat No. 7 showed a green light; put both engines full speed astern."

The ship's log states:

"3:50. Full speed ahead.
"4:00. Slow; pilot boat on port bow showing red light.
"4:05. Pilot boat 7 showed a green light; wheel hard aport and both engines full speed astern."

The engineer's log states:

"3:52. Full speed. 4:05, a. m. slow bell; full astern 4:06; stop 4:08."

It will thus be seen that nothing whatever was said either in the scrap or the ship's log about any failure of the pilot boat to show her masthead light or about any time during which all lights disappeared, upon which circumstances the steamer's witnesses laid great stress. The ship's log reads as if the red light had not been seen before 4, whereas the scrap log shows that it had been seen at 3:50, and as if the engines had been slowed immediately on seeing the red light (as they should have been), whereas the scrap log shows they were not slowed for 10 minutes after. The engine room log shows that, instead of going from slow ahead at 4 to full speed astern at 4:05, the engines were first put at slow 4:05, and full speed astern 4:06, the loss of a minute when collision must have been inevitable.

This collision took place just about the change of the watch, and the conclusion is irresistible that those on board the steamer who ought to have been diligently observing the pilot boat were not doing so.

The decree is reversed, with costs, and, both vessels being held at fault, the District Court is directed to enter a decree in favor of the libelants for half damages, with an order of reference.