11 F.(2d)—40

---

## THE PAULSBORO.

(District Court, S. D. New York. June 2, 1925.)

1. **Collision ⬡94, 106—Steamer, passing tug engaged to tend it, held not within rule of overtaking vessels relative to need of signals, but situation of special circumstances.**

Steamer which, while taking on pilot, fell behind tug engaged to tend it up channel, was not, on catching up with it, within rule of overtaking vessels and so required to give passing signal, as the two vessels cannot be regarded as navigating independently, but situation is one of special circumstances in which vessels are co-operating in an agreed maneuver, and assisting tug must use due care for its own safety.

2. **Collision ⬡94—Were overtaking rule prima facie applicable on steamer catching up with tug engaged to assist it, tug having easy command of motions is bound to keep away.**

Even if overtaking rule were prima facie applicable to steamer catching up with tug, engaged to assist it up channel, tug, having easy command of her motions, is bound to keep away when there is nothing to prevent it.

3. **Collision ⬡98—Under evidence, cause of collision was not failure of steamer to give passing signal to its tug, but tug running off swell and its wheel jamming.**

Under evidence, failure of steamer to blow passing signal, on catching up with tug engaged to assist it, up channel, did not contribute to the accident, the tug, 200 feet to steamer's starboard, having run off a swell and sheered to port, and its steering gear having become jammed, preventing it from avoiding collision.

In Admiralty. Libel by the American Merchant Marine Insurance Company against the steamship Paulsboro. Libel dismissed.

Decree affirmed 11 F.(2d) 628.

Alfred Hayes, of New York City (John Spoor Stover, of New York City, of counsel), for libelant.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Prizer, of New York City, of counsel), for claimant.

AUGUSTUS N. HAND, District Judge. November 21, 1919, the tank steamer Paulsboro, bound in ballast for Port Arthur, drawing 16 feet 8 inches aft, arrived off the mouth of the Sabine Pass. When she had reached a point not far from Bell Buoy, which lies at the entrance of the Pass, a half a mile below the outer end of the east jetty, the tug John Sealy came up on the starboard side and hailed her. She asked to be engaged to "tend" the steamer in. The tug proceeded up ahead of the Paulsboro on her starboard side, and gained on the latter after the Pauls-

boro took on a pilot. The steamer proceeded after that at the rate of about 11 miles an hour and the tug at 10 miles. The length of the Paulsboro was 435 feet, and the John Sealy 89.9 feet. The steamer went up somewhat east of the center of the channel, with the tug about 200 feet to her starboard.

Simonton, the master of the tug, gave the following testimony before the local inspectors, of a collision between the two vessels which resulted in the total loss of the tug:

"About 6:45 a. m. I spoke the steamer Paulsboro about 3 miles east of Sabine Bar. The weather was hazy and a good swell was on. The captain told me O. K., and to go in with him. We followed the ship to the bar on the starboard side. When the ship stopped to pick up the pilot, I started on in. Just inside the jetties the ship was passing me and well on starboard about 200 feet. The tug took a sheer toward the ship. I started to put helm hard to port, and my steering gear fouled. I saw I could not release it, so rang bell full speed astern to check headway and break sheer on tug. The tug struck the ship well aft of the bridge, causing the tug to take a heavy list to starboard, and the tug took quite a bit of water through the engine and fire room doors. I then discovered the bow of the tug was badly smashed in. I gave a stop bell to ascertain the extent of damage to the tug. I heard some one shout that a man was overboard. I ran aft to the after part of the tug and could see an object in the water between me and the sun, but could not make out what it was. I saw the engineer on watch on after part of the deck, and my bell pull at pull was broken or something, so told him to back her. The tug was still going ahead. The mate ran and grabbed the wheel, put her hard to port, and gave me two bells and a jingle. * * *

"Q. Had the steering gear given you trouble before? A. It had given trouble before, but it was working all right that morning. * * *

"Q. Was the engine going full speed astern when she struck the ship? A. I don't know. * * *

"Q. If it had been going full speed astern, would it have prevented a collision? A. It might have done so. I do not know; it is very doubtful."

Prior to the collision, no signals were interchanged. The libelant contends that: (1) The Paulsboro was an overtaking vessel, and should have blown a signal for leave to pass. (2) The Paulsboro passed too near to the John Sealy, and caused a suction which drew in the tug and resulted in the collision. (3)

The collision was not caused by the jamming of the steering gear of the tug.

[1] In my opinion, the Paulsboro was not within the rule relating to overtaking vessels.

Karling, the third mate of the Paulsboro, said he first noticed the tug "when she came close to us to ask to assist us in."

McFarland, the pilot, said:

"When I went on board, the captain told me he had employed the tug Sealy to tender the vessel to Port Arthur and back. * * * We call them tender, to attend a vessel while she comes up."

He also testified at pages 9, 10:

"Q. Captain, is it usual or unusual for a tug, when attending a steamer coming up the Sabine Pass, to steam alongside of her? Yes, sir. * * *

"Q. What do the tugs usually do when coming up with the steamers? A. They take a tow rope whenever required from the pilot. * * *

"Q. You said it was usual for a tug to steam alongside of the steamer she is assisting? A. Yes sir.

"Q. Where and how close? A. Well, different distances; they keep close enough so they can be hailed if you need to use them.

"Q. Are they sometimes a little ahead and sometimes a little behind? A. Yes, sir."

Guess, the mate of the tug, testified:

"Q. Was any arrangement made between the Sealy and Paulsboro? If so, what? A. Yes, sir; the captain of the Paulsboro accepted our services to assist the ship.

"Q. Now tell us in your own way what happened after that? A. Why after speaking the ship we went along on the starboard side of the ship; that is when I left the wheel.

"Q. Tell what happened up to the time you left the wheel? A. Just coming right alongside the ship. At the time I left the wheel the Sealy was about halfway between the bridge and smokestack of the Paulsboro on the starboard side of her. I went in the messroom for breakfast, and the captain (had) taken the wheel."

Hannen, the assistant engineer of the tug, also said:

"We proceeded inside the jetties, while they was waiting for the ship to take her pilot aboard. It was pretty rough out there, and we ran in to get out of the sea. I guess that is the reason he came in."

Simonton, the master of the tug, also testified that the tug had been handling the Paulsboro all the time, had taken her up on a number of previous occasions, and was going up in quite the usual way.

In the foregoing circumstances, the two

vessels cannot, in my opinion, be regarded as navigating independently, and the situation is one of special circumstances rather than that of an overtaking vessel. I have not been referred to any decision which would seem directly to govern this case, but the situation in The Monterey, 161 F. 95, 88 C. C. A. 259, was somewhat analogous. There the Monterey ran into a pilot boat while the two vessels were navigating so that the pilot boat's yawl might bring a pilot to the steamer. The Circuit Court of Appeals said:

"The pilot boat attributes the collision to a rapid change of course by the steamer under a starboard helm, while the steamer attributes the collision to the attempt of the pilot boat to cross her bows, and to her failure to show proper lights. * * * The statute creates no presumption that one is the privileged and one is the burdened vessel, and defines no course of navigation to be followed by either. It is a case of special circumstances. The vessels are co-operating in an agreed maneuver, and each is bound to act prudently toward the agreed end. In this case, as the pilot boat intended to come to a stop about a mile ahead and on the port bow of the steamer, it is evident she could not have been watching the steamer's movements. On the other hand, if the steamer had observed the pilot boat, she would have come (as it was her duty to do) to a stop or to a very slow speed at a safe distance from her."

In the present case, the Paulsboro and the John Sealy were likewise "co-operating in an agreed maneuver." The tug was attending the Paulsboro up the channel, and was rarely, if ever, beyond a distance from her within which any needed service could be rendered. That the master of the tug was alive to this situation is shown by the following extract from his testimony:

"Q. You were paying attention to the navigation as you were going up around you? A. Yes, sir.

"Q. You knew where the Paulsboro was all the time didn't you? A. Yes, sir.

"Q. You didn't think it necessary to go any farther eastward than you were going? A. No, sir.

"Q. If you had thought so, you would have gone farther eastward, wouldn't you? A. Yes, sir.

"Q. Your tug only drew 9 feet of water, approximately, didn't it? A. It drew about that, the draft is 10 feet I believe.

"Q. There was plenty of room for you all the way up to the east jetty, wasn't there? A. Yes, sir; I could have went in there.

"Q. But you didn't think it was necessary? A. No, sir.

"Q. In fact there was nothing unusual in the way either you or the Paulsboro came up, was there? A. Nothing out of the ordinary; no."

The more the testimony is examined, the more clearly the facts will be seen to fall within the decisions relating to "assisting" tugs which must use due care for their own safety. In The Olympic, 224 F. 436, 140 C. C. A. 130, a helper tug engaged in docking a steamer, and, drawn by suction within reach of her blades, was held to be responsible for any loss occurring by reason of the position which she selected. The City of New York, 54 F. 181, 4 C. C. A. 268. See, also, The Servia, 13 S. Ct. 817, 149 U. S. 144, 37 L. Ed. 681.

[2] Moreover, even if the "overtaking" rule were prima facie applicable, a tug having "easy command of her own motions * * * was bound to keep away" from a more cumbrous vessel "when there was nothing to prevent her from doing so." The Mayumba (D. C.) 21 F. 476. See, also, The A. P. Crammer (D. C.) 1 F. 255; The Rose Culkin (D. C.) 52 F. 328.

[3] In any event, the failure to blow a passing signal did not contribute to the accident. The Paulsboro was keeping straight on her course all the time, and the master of the tug was on the bridge and knew all about her movements. We find in his deposition already quoted:

"Q. You were paying attention to the navigation as you were going up around you? A. Yes, sir.

"Q. You knew where the Paulsboro was all the time, didn't you? A. Yes, sir.

"Q. You didn't think it necessary to go any farther eastward than you were going? A. No, sir.

"Q. If you had thought so, you would have gone farther eastward, wouldn't you? A. Yes, sir."

The Paulsboro did not pass so close to the tug that any danger from suction could be anticipated, so that her mode of navigation, of which the master of the Sealy was at all times aware, was not negligent.

The master of the tug, Simonton, Becker, the mate, McFarland, the pilot of the Paulsboro, and Karling, her third officer, all estimated the distance between the vessels before the tug started toward the Paulsboro at 200 feet. Hannen, the second engineer of the tug, alone placed the distance at less. He said:

"A. I judge about 75 feet.

"Q. About 75 feet? A. That is as near as I can judge.

"Q. Was or not the tug at that time east of the east jetty and out of the channel? A. Well, I don't know nothing about that part of it. Ask the captain for that.

"Q. You don't know? A. That is his department to know all that. I don't know whether he was out of the channel or not."

It is necessary to discard the testimony of the witnesses most entitled to credence both by weight of numbers and experience, in order to attribute the initial cause of the collision to suction. It is manifest that, if the tug was 200 feet to the starboard of the Paulsboro, the stern of such a short vessel as the tug could not get into an area of excess pressure which would cause a marked sheer. If at anything like the distance of 200 feet from the Paulsboro, any sheer which she might experience from the areas of excess pressure would carry her astern of the Paulsboro. The collision must therefore have been initiated by causes other than suction.

In the extended protest of Capt. Simonton, Gus Becker, and Second Engineer Hannen, made after the collision, is the following account of what occurred:

"A long heavy swell rolling and the wind from the east. At about 7:45 a. m., when the tugboat ran off the swell, she sheered to port; attempted to port the helm, but steering gear apparently was jammed or fouled and refused answer."

Simonton also testified before the local inspectors:

"I started to put helm hard to port, and my steering gear fouled."

"Q. Had the steering gear given you trouble before? A. It had given trouble before, but it was working all right that morning."

Simonton further testified, in his deposition offered at the trial:

"Q. Well, Captain, tell us in your own way what happened that caused your tug Sealy to strike the Paulsboro? A. The first thing the steering gear jammed on her; then she got into the suction of the ship, and ship sucked her in.

"Q. Tell us whether it is or whether it is not a fact that the reason you tried to throw your wheel to port was because you felt the suction of the Paulsboro? A. Tug runs off a sea and takes a sheer to port, there's where I tried to port my wheel."

In view of this testimony, it seems unreasonable for the libelant to claim that the steering gear could not have jammed, and that the master only imagined that it did.

The master's story fully explained the cause of the collision. "The tug ran off the swell" and "sheered to port," Simonton, Becker, and Hannen said in their protest when the occurrence was fresh in their minds. Thus the heavy swell was the initial force which brought the tug into a position nearer the Paulsboro—a force which the jammed steering gear could not counteract. After being thus swept in by the swell, the stern of the tug doubtless got into the area of strong outward pressure near the stern of the Paulsboro. This caused the bow of the tug to sheer violently toward and into the starboard side of the Paulsboro. I think neither Admiral Taylor nor the claimant's expert, Prof. Reeve, would theoretically differ as to the cause of the collision, if the facts were assumed as I have found them.

Nothing was said in the protest or before the local inspectors about failure to exchange passing signals, and it is to be noticed that the tug herein, so far as the record shows, appears to have thought it unnecessary to signal the Paulsboro when she passed her about the time the Paulsboro was taking on her pilot. In my opinion the contention that the Paulsboro was subject to the rules relating to overtaking vessels or that the damage to the Sealy was primarily caused by suction is an afterthought, unsupported by the evidence, and dependent upon theories not applicable to the facts of the case.

The libel is dismissed, with costs.