**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CROWLEY MARINE SERVICES INC., a
Delaware corporation,
                    *Plaintiff-Appellant,*

              v.

MARITRANS INC., a Delaware
corporation; MARITRANS
TRANSPORTATION INC., a Delaware
corporation; MARITRANS OPERATING
COMPANY LP, a Delaware Limited
partnership; MARITRANS GENERAL
PARTNER INC., a Delaware
corporation,
                    *Defendants-Appellees.*

No. 04-35724

D.C. No.
CV-02-02487-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Chief Judge, Presiding

Argued and Submitted
October 17, 2005—Seattle, Washington

Filed May 8, 2006

Before: Richard D. Cudahy,* Thomas G. Nelson, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

---

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

5121

**COUNSEL**

Vincent R. Larson, Daniel J. Gunter, and C. William West, Riddell Williams P.S., Seattle, Washington, for plaintiff-appellant Crowley Marine Services, Inc.

Marc E. Warner, LeGros, Buchanan & Paul, Seattle, Washington, for defendant-appellee Maritrans Operating Company L.P.

**OPINION**

McKEOWN, Circuit Judge:

This case calls on us to decide a matter of first impression regarding the application of the International Regulations for Preventing Collisions at Sea, Oct. 20, 1972, 28 U.S.T. 3459, T.I.A.S. 8587, *adopted by statute at* 33 U.S.C. § 1602, better known by their common acronym as the COLREGS. Crowley Marine Services, Inc. ("Crowley") owned and operated a tug boat hired to accompany an oil tanker operated by Maritrans Operating Company L.P. ("Maritrans") to an oil platform in the Puget Sound. During the crossing the two vessels collided, causing more than $2 million in damages.

In the inevitable suit that followed, each side identified numerous violations of the COLREGS as the alleged cause of the collision. The district court apportioned fault for the accident as 75% to Crowley and 25% to Maritrans. The district court found that the two vessels were operating in concert according to agreed maneuvers, and therefore determined that several substantive provisions of the COLREGS at issue were inapplicable. Specifically, the court ruled that this situation presented "special circumstances" that provide an exception to the COLREGS. We hold that the plain language of the COLREGS precludes such a broad exception, and remand for the district court to reconsider the relative liability of the parties consistent with this opinion.

## BACKGROUND

Crowley provides vessel escort and assistance services in Puget Sound. Federal law requires that any tanker transiting Puget Sound east of navigational buoy "R" with oil cargo must be escorted by two vessels. Maritrans hired Crowley to provide escort services for the Allegiance, an oil tanker under the command of Captain Joseph Semler, on the evening of January 19, 2002. Crowley provided two tug boats: the Sea

King, under the command of Captain Donald Nekeferoff, and the Chief, under the command of Captain William Lowery.

At 8:50 p.m., the three captains held a radio conference to plan the escort. According to the agreed-upon plan, the Allegiance would travel east towards Buoy R at a speed of about 15 knots. While the Allegiance was still two to three miles away, the two tugs would depart from Buoy R at about 12.5 knots. The Allegiance would gradually overtake the two tugs and pass between them, at which point the tugs would take up position on either side of the tanker to complete the escort maneuver, with the Chief tethered to the stern and the Sea King on the tanker's port shoulder.

For approximately the first forty-five minutes, the maneuver went according to plan. Each of the three vessels sailed with auto-pilot set to 58 degrees true, with the Allegiance gradually overtaking the tug boats. During this time both the Allegiance and the Chief made numerous adjustments to their course to account for the fact that the vessel's auto-pilot function maintains a ship's heading (the direction in which the bow points) but does not reflect changes due to wind or currents. The Sea King made no comparable adjustments to its course.

By 9:35 p.m., with the Sea King still a short distance ahead, the pilot and helmsman aboard the Allegiance realized that the tug boat was also closing the lateral distance between the vessels. Nonetheless, both men testified that they had seen escort tugs running close alongside tankers many times before, and saw no cause for alarm. As the Sea King came closer and closer, Captain Semler aboard the Allegiance decided that the vessels' proximity exceeded his comfort zone. Although later testifying that he did not see any risk of collision, Captain Semler radioed Captain Nekeferoff aboard the Sea King, inquiring, "Don, are you ok?" Captain Nekeferoff responded affirmatively.

Shortly after the radio communication, the Allegiance and the Sea King collided, with the tug boat pushed along by the tanker's bow and nearly capsizing as she rolled to the tanker's starboard side while heeling to port. About halfway down the tanker's side, the Sea King righted itself as the tanker sailed past. The exact dynamics of the collision were disputed. Crowley presented expert testimony that the two vessels gradually converged until the Allegiance struck the Sea King almost directly from behind. Maritrans presented testimony that the Sea King veered suddenly to starboard, into the path of the Allegiance.

At trial, each side attributed fault entirely to the other, relying in large part on the COLREGS. The COLREGS provide a "universal system of sea traffic rules" applicable to vessels in international waters. William Tetley, *International Maritime and Admiralty Law* 237 (2002). Originally adopted by treaty under the auspices of the International Maritime Organization in 1972, the COLREGS have since been incorporated into the national law of "every shipping nation in the world." *Id.* These rules apply to "all vessels upon the high seas and in all waters connected therewith navigable by seagoing vessels." Rule 1(a).

Crowley argued that Maritrans violated four provisions of the COLREGS: Rule 5, which establishes a duty to maintain a lookout; Rule 8, which establishes a duty to avoid collision; Rule 13, which makes an overtaking vessel responsible for avoiding collision; and Rule 34, which requires vessels in sight of each other to give a signal when changing course. Maritrans countered that Crowley violated Rule 5 by failing to maintain a proper lookout. Maritrans also maintained that Crowley reasonably should have investigated the risks stemming from Captain Nekeferoff's history of alcoholism and health problems, conditions that appeared to be related to a temporary loss of situational awareness shortly before and during the collision.

The district court credited Maritrans' arguments, finding that because the two vessels were operating according to agreed maneuvers, Rules 8 and 13 of the COLREGS did not apply. To reach this decision, the district court invoked Rule 2, which provides that "[i]n construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger." Rule 2(b).

Although noting that the plain language of the special circumstances exception in Rule 2 did not provide such an exception on its face, the district court found that "courts have either expanded the scope of Rule 2(b)'s special circumstances or have created a wholly separate category of special circumstances involving vessels operating in concert and pursuant to agreed maneuvers." Thus freed from the restrictions of Rule 8 and Rule 13, which would have focused on Maritrans' fault for failing to avoid the Sea King, the district court found Maritrans to be only 25% responsible for the accident.

## ANALYSIS

This opinion addresses the proper scope of Rule 2(b)'s special circumstances exception to the COLREGS. The remaining issues presented by Crowley's appeal are addressed in a separate memorandum disposition.[1]

The district court observed that jurisprudence regarding the scope of the special circumstances exception has done "little to clarify murky waters." This feeling is not unwarranted and

---

[1]Crowley presented two other contested issues—Crowley's vicarious liability for Captain Nekeferoff's medical and alcohol problems and the admission of expert testimony regarding hydrodynamic forces that would have affected the collision. These matters are addressed in a memorandum disposition filed simultaneously with this opinion.

may actually understate the dearth of applicable precedent. Relevant case law largely dates to the early part of the last century, decades before the COLREGS were adopted in the 1970s. The permissive decisions in these cases have not been reconciled with the plain language construction of the contemporary COLREGS as a whole, thus leaving the murky waters alluded to by the district court.

## I.  THE LAW GOVERNING COLLISIONS AT SEA

[1] Three of the COLREGS' collision avoidance rules are at issue: two rules that govern a ship's obligation to avoid collision, Rules 8 and 13, and one rule that provides an exception to the general rules, Rule 2. Crowley primarily alleges that the Allegiance violated Rule 13, which provides that "any vessel overtaking any other shall keep out of the way of the vessel being overtaken." Rule 13(a). A ship is "overtaking" another when approaching "from a direction more than 22.5 degrees" aft of perpendicular. Rule 13(b). Further, "[w]hen a vessel is in any doubt as to whether she is overtaking another, she shall assume that this is the case and act accordingly." Rule 13(c). The Allegiance, which was approaching the Sea King from "at least 22.5 degrees aft of perpendicular," was overtaking the tug. Nothing in the text of Rule 13 allows us to escape the conclusion that as the overtaking vessel, the Allegiance had the responsibility of avoiding the Sea King.

[2] Crowley also argues that, by failing to slow down, the Allegiance violated Rule 8(e), which provides that "[i]f necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion." Rule 8(e). On its face, the text of Rule 8(e) supports Crowley's position. The pilot of the tanker testified that the proximity of the vessels had exceeded his "comfort zone," and yet he took no action to avoid the collision other than a call to the Sea King to ascertain if that vessel was "OK." Finding that the agreed maneuvers of the three vessels precluded a "mechanical appli-

cation" of the rules, the district court diluted Rule 8 by allocating some liability to Maritrans for failing to take more decisive action once the proximity of the Sea King exceeded Captain Semler's comfort zone. But Rule 8(e) sets forth specific actions to be taken in order to avoid collision, including reducing speed or changing course. *Cf. In re Nat'l Shipping Co. of Saudi Arabia*, 147 F. Supp. 2d 425, 440 (E.D. Va. 2000) (allocating fault 65% to party for, in part, failing to reduce speed or change course in violation of Rule 8). Given the overriding policy of the COLREGS and other navigational rules, "it is not necessary for a collision to be imminent or even probable before the obligation imposed by them accrues . . . . There is a danger or risk of collision whenever it is not clearly safe to go on." *Ocean Marine Ltd. v. United States Lines Co.*, 300 F.2d 496, 499 (2d Cir. 1962) (applying earlier version of the inland navigational rules) (internal marks omitted). On the facts of this case, the Allegiance's failure to comply with Rule 8(e)'s specific directives cannot be lightly overlooked.

**[3]** If Rules 8 and 13 of the COLREGS apply to Maritrans' actions, the apparent statutory violations would inform, in great part, the allocation of liability between the Allegiance and the Sea King. Under admiralty law, if a ship is in violation of an applicable statutory duty at the time of a collision, there is a presumption that the violation contributed to the accident. *The Pennsylvania*, 86 U.S. 125, 136 (1873), *overruled on other grounds in United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975). This presumption may be rebutted by a showing that the statutory violation "could not reasonably be held to have been a proximate cause of the collision." *Churchill v. The F/V Fjord*, 892 F.2d 763, 770 (9th Cir. 1988) (quoting *Pac. Tow Boat Co. v. States Marine Corp.*, 276 F.2d 745, 749 (9th Cir. 1960)) (internal quotation marks omitted). Where both parties to a collision share in the fault, "liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault." *Reliable Transfer*, 421 U.S. at 411. Although there is

no pre-determined formula for weighing COLREGS violations against each other, the violations must be accounted for under the *Pennsylvania* rule.

## II.   THE "SPECIAL CIRCUMSTANCES" EXCEPTION

Maritrans does not contest that its actions would violate Rules 8 and 13. Rather, Maritrans tries to fit within the special circumstances exception set forth in Rule 2 by emphasizing that no court has applied the overtaking rule to vessels that were operating in concert pursuant to maneuvers conducted under an agreed-upon plan. The district court, although criticizing Maritrans' attempt to stretch the special circumstances exception, ultimately adopted this reasoning.

**[4]** Rule 2(b) provides that "[i]n construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger." The question is whether such special circumstances are limited to those involving immediate danger, or include circumstances that are "special" in a more generic sense. The district court found, and Maritrans argues on appeal, that "courts have either expanded the scope of Rule 2(b)'s special circumstances or have created a wholly separate category of special circumstances involving vessels operating in concert and pursuant to agreed maneuvers." We disagree on both counts.

**[5]** The plain language of the statute is our starting point. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning . . . ."). By its terms, Rule 2 limits "special circumstance[s]" to those circumstances "which may make departure . . . necessary to avoid immediate danger." In other words, vessels may justify departure from the COLREGS in order to

avoid immediate danger, but not for more generic special circumstances.**²** *Cf. Dahlia Maritime Co., Ltd. v. M/S Nordic Challenger*, 1993 WL 268413, at *16 n.2 (E.D. Louis. 1993) (applying Rule 2 where adherence to the COLREGS led to an "impending unavoidable collision"); *In re Otal Investments, Ltd.*, 2006 WL 14512, at *7 (S.D.N.Y. 2006) (holding that Rule 2 "applies to facts 'where there is an immediate danger, perfectly clear; and the departure from the rules must be no more than is necessary' ") (*quoting Yang-Tsze Ins. Ass'n v. Furness, Withy & Co.*, 215 F. 859, 861-62 (2d Cir. 1914). This interpretation is echoed in one of the leading admiralty law treatises: "Courts, had they been so minded, could have sailed a whole armada of exceptions through the opening made by this Rule. Actually, it has been very narrowly construed, and will not excuse a violation of the plain mandate of the more specific Rules . . . ." Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 508 (2d ed. 1975).

**[6]** Adhering to the plain meaning of the statute is particularly appropriate in this context. The COLREGS are strictly construed, to the extent that "[t]he general lawyer . . . must accustom himself to a far different atmosphere in dealing with these Rules, for they are strictly and literally construed, and compliance is insisted upon." Gilmore & Black, *The Law of Admiralty* 489.**³** The plain text of the COLREGS allows only

---

**²**Our reading of the text of Rule 2 finds support in decisions applying Article 27 of the predecessor to the Inland Water Rules, the text of which is exactly the same as Rule 2. In *Zim Israel Navigation Co., Ltd. v. S.S. American Press*, 222 F. Supp. 947 (S.D.N.Y. 1963), the court noted that under Article 27, "[d]eparture from the statutory duty imposed upon the vessels is justified only when necessary to avoid immediate danger, and the burden of proof is upon the vessel which alleges justification for the departure." *Id.* at 954 (internal citations omitted).

**³**The long tradition of applying the rules strictly reflects their origins in earlier practice. *See Belden v. Chase*, 150 U.S. 674, 698-99 (1893) (describing the rules for preventing collisions, as they existed on the eve of the twentieth century, as "not mere prudential regulations, but binding enactments, obligatory from the time that the necessity for precaution begins" and insisting that they be "rigorously enforced").

one avenue to steer clear of their obligations: the "special circumstances" exception enshrined in Rule 2,[4] which is limited to situations involving immediate danger.

In reaching a contrary conclusion, the district court relied upon a series of cases, cited by Maritrans, holding that vessels operating in concert participate in a "special circumstance" within the meaning of Rule 2. These cases, which pre-date the current COLREGS by many decades, either reflect unique circumstances or (as noted by the district court) apply a relatively casual version of the special circumstances exception. Because these cases do not interpret Rule 2 and, in fact, conflict with the plain meaning of the current COLREGS, we decline to adopt their analysis.

In *The Joseph Vaccaro*, 180 F. 272 (D.C. La., 1910), the court declined to apply "hard and fast rules as to overtaking or crossing" because it was difficult to ascertain which vessel was the overtaking or crossing vessel; indeed, in the facts submitted to the court, the two ships at issue seemed to alternate roles. *Id.* at 275. Although the collision in that case involved a steamship and a tug, the agreed maneuver (delivering a pilot to the steamship) had unmistakably ended at the time of the collision; both ships were continuing on their way with no prior agreement or concurrent communication regarding their operations in the close quarters of the South Pass of the Mississippi River. *Id.* at 273-74.

---

[4]Courts have continued to apply an analogous *in extremis* doctrine that predates the COLREGS, and excuses violations of the rules where one vessel is placed in "extreme danger" by the faulty maneuvering of another vessel. *Complaint of G&G Shipping Co., Ltd. of Anguilla v. The M/V "Nedlloyd VanNoort"*, 767 F. Supp. 398, 407-08 (D.P.R. 1991) (*quoting The Blue Jacket*, 144 U.S. 371, 392 (1892)). While the relationship between the *in extremis* doctrine and the special circumstances exception in Rule 2 has not been resolved with utmost clarity, both rules allow a party to a collision to escape liability for violations of the applicable rules only when necessary to avoid an immediate danger.

In *The Paulsboro*, 11 F.2d 625 (S.D.N.Y. 1925), the court refused to apply the overtaking rule where a tugboat and tank steamer collided while the tug was guiding the larger vessel into port. *Id.* at 626-27 ("[T]he two vessels cannot, in my opinion, be regarded as navigating independently, and the situation is one of special circumstances rather than that of an overtaking vessel."). Noting the dearth of caselaw on point, the court relied on an earlier Second Circuit decision, *The Monterey*, 161 F. 95, 97 (2d Cir. 1908), that had reached a similar conclusion in refusing to apply presumptions of liability for violations of the "steering and sailing rules" (precursors of Part B of the current COLREGS, which are entitled "Steering and Sailing Rules") when the vessels were engaged in an agreed maneuver.

**[7]** To the extent that these cases hold that the cooperation between a tug boat and her charge is a "special circumstance," either within or without Rule 2(b), that excuses neglect of the COLREGS, we decline to embrace their teaching. Scant evidence in cases predating the contemporary COLREGS by several decades cannot overcome both the plain language of Rule 2, which provides an exception to the other rules only when "necessary to avoid immediate danger," and the overriding mandate to apply the COLREGS strictly.

**[8]** This result does not lead to awkward consequences, as Maritrans would have us believe. The COLREGS prescribe a set of "rules of the road" for international navigable waters, ensuring that all vessels understand the same rules of engagement. There is no reason that these rules should not also apply to vessels under full sail in the Puget Sound, even those vessels operating in concert. As written, the COLREGS reflect numerous policy judgments that are not vitiated by the fact of agreed cooperation between two vessels.

An examination of the facts of this case serve to illuminate this point. Maritrans argues that the Allegiance was *supposed to* overtake the tugs, and thus should not be held liable under

the overtaking rule. But the COLREGS do not prohibit one vessel from overtaking another, they simply state that the overtaking vessel shall be responsible for avoiding the other. The policy behind this rule reflects realities of navigation, and is not changed by the fact that the overtaken vessel has agreed to be overtaken. For example, in commenting on an identical overtaking rule in the Inland Navigational Rules Act of 1980, a United States Senate report recognized "that the overtaking vessel should have less problem in keeping clear and avoiding collision than the vessel being overtaken, even if the overtaken vessel has agreed to allow the maneuver." S. Rep. No. 96-979, at 12 (1980) *as reprinted in* 1980 U.S.C.C.A.N. 7068, 7079 (1980).[5]

Another example is perhaps even clearer—the district court diluted the application of Rule 8, which requires vessels to take action to prevent collision. A vessel perceiving such a risk of collision should not be released from the COLREG's specific instructions to take precautionary measures simply because it is engaged in a predetermined maneuver.[6] *Cf. The Monterey*, 161 F. at 97 (applying an exception for special circumstances, but noting that "[t]he vessels are co-operating in an agreed maneuver, and each is bound to act prudently toward the agreed end"). Maritrans' theory is akin to standing on principle and insisting on the right of way even in the face of an imminent collision.

---

[5]Although distinct from the COLREGS, the legislative history underlying the adoption of the Inland Navigational Rules is instructive in this case. In adopting the Inland Navigational Rules, Congress noted that "the bill attempts to make them as consistent as possible with the [COLREGS]." S. Rep. No. 96-979, at 1 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 7068, 7068 (1980).

[6]The maneuver situation is different than the judicially-recognized *in extremis* exception. Maritrans does not argue that the Allegiance's violations of the COLREGS were taken in response to an immediate danger created by the Sea King.

**[9]** Our analysis of the applicability of the COLREGS does not, of course, determine the ultimate allocation of liability in this case. Despite construction of the COLREGS, including the special circumstances exception, in accord with their plain meaning, the assignment of liability is not absolute. We leave to the district court to factor and weigh relative liability in a fault allocation analysis. *See, e.g.*, *Complaint of G & G Shipping Co.*, 767 F. Supp. at 412 (apportioning liability between the parties 80% and 20% upon finding several violations of the COLREGS on both sides); *Hal Antillen N.V. v. Mount Ymitos MS*, 147 F.3d 447, 451-52 (5th Cir. 1998) (upholding part of a district court decision apportioning minimal liability on the basis of a violation of Rule 5 because the violation had not been a proximate cause of the collision).

The flexibility and adaptability of the apportionment concept explain why we are unswayed by the collection of policy arguments offered by Maritrans.[7] The blameworthiness of each party's conduct would ultimately depend not only on the rules that each party violated but on whether those violations actually caused the collision, considering all the facts of the case. *See, e.g.*, *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991) (recognizing that under *The Pennsylvania* and *Reliable Transfer*, an assessment of comparative fault must be based on all the facts of the case, not on a simple count of how many rules of navigation each vessel has violated). Therefore, the district court should consider the pre-arranged escort plan, along with all the other facts, when it apportions fault. It may well be that the Allegiance's violation of Rule 8(e) contributed relatively little to the eventual collision in relation to the Sea King's failure to adjust course and Captain Nekeferoff's apparent loss of situa-

---

[7]The Supreme Court explained that it established comparative fault liability in admiralty in order to bring "flexible and fair remedies in the law maritime." *Reliable Transfer Co.*, 421 U.S. at 409. It is this flexibility that allows a " 'just and equitable' allocation of damages" proportional to the comparative degree of fault of each party. *Id.* at 411.

tional awareness. However, neither is there any basis for concluding (on the other extreme) that such considerations bypass the COLREGS entirely.

[10] The judgment of the district court is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this opinion.